The BANK OF NEW YORK and BNY
Australia Limited, Plaintiffs,

v.

BANK OF AMERICA and Bank of
America Australia Limited,
Defendants.

No. 94 Civ. 3057 (LAP).

United States District Court,
S.D. New York.

May 27, 1994.

his disclosures except those provided for by the patent and copyright laws).

Jed S. Rakoff, John Sullivan, Fried, Frank, Harris, Shriver & Jacobson, A Partnership Including Professional Corporations, New York City, for plaintiffs.

Daniel Wallen, Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for defendants.

PRESKA, District Judge:

This case is a contract dispute between two Australian banks and their American parent companies. Plaintiffs originally filed the action in the Supreme Court of the State of New York, and defendants removed it here, alleging 28 U.S.C. § 1332 (diversity) and 12 U.S.C. § 632 (international banking) as bases for jurisdiction. Presently before the Court are a motion by plaintiffs to remand the case back to State court and motions by the defendants (1) to dismiss or stay the action in favor of a parallel Australian proceeding; (2) to dismiss as to Bank of America Australia Limited (BOAA) for lack of personal jurisdiction; and (3) to vacate a temporary restraining order issued by the state court judge. Because the Court finds that it lacks subject matter jurisdiction, plaintiffs' motion to remand the action is granted, and defendants' motions are not addressed.[1]

### Background

BNY Australia (BNYA) is an Australian corporation with its principal place of business in Sydney, Australia. It is a wholly-owned subsidiary of The Bank of New York (BNY), a New York banking corporation with its principal place of business in New York City. BOAA is an Australian corporation with its principal place of business in Sydney, Australia. It is a wholly-owned subsidiary of Bank of America (BOA), a national banking association with its principal place of business in San Francisco, California.

On or about November 19, 1993, BNYA and BOAA, using their parent companies as agents, entered into a letter agreement committing themselves to engage in exclusive negotiations for the purchase of certain of BNYA's assets by BOAA. Specifically, the parties were to discuss the possible sale of BNYA's interest in several loans made by BNYA to a group of Australian companies. Over the next several months, such discussions did occur and draft closing documents were exchanged. However, despite several extensions of the period for exclusive negotiations, the parties were unable to reach a final agreement. BNYA finally terminated the dialogue in March 1994.

In April 1994, the parties traded complaints. BOAA and BOA, on April 11, 1994, commenced an action in the Supreme Court of New South Wales in Sydney against BNYA and BNY for damages and equitable relief. The complaint alleges that the parties reached agreements, enforceable under Australian and California law, for the sale to BOAA of BNYA's interests in several loans and that those agreements have been breached. The next day, April 12, 1994, BNYA and BNY commenced this action in the Supreme Court of the State of New York, seeking a declaratory judgment that neither BNYA nor BNY have any obligation to BOAA or BOA concerning the failed transaction.

After filing their respective complaints, the parties began efforts to frustrate progress in each other's actions. BOAA and BOA, on April 20, 1994, secured a scheduling order from the Australian court for a motion to enjoin BNYA from prosecuting this New York action. Two days later, BNYA and BNY procured an Order to Show Cause and a Temporary Restraining Order from Justice Herman Cahn of the Supreme Court of the State of New York enjoining BOAA and BOA from seeking an injunction from the Courts of Australia to bar the adjudication of this New York action.

---

1. Oral argument on the plaintiffs' motion to remand was held on May 11, 1994. The Court granted the motion from the bench and announced that a written order would issue. Prior to the issuance of the written order, defendants submitted a motion for reconsideration. Finding that the motion presented authorities that were not previously before the Court, the motion was granted, and plaintiffs were directed to submit a response, which they did. The present order reflects consideration of the motion to remand as well as the motion for reconsideration.

Justice Cahn set the return date on the Order to Show Cause for May 2, 1994.[2] On April 26, however, BOAA and BOA removed the New York action to this Court, alleging 28 U.S.C. § 1332 (diversity) and 12 U.S.C. § 632 (international banking) as bases for jurisdiction. Along with their removal petition, defendants filed motions to dismiss or stay the action in favor of the Australia action and to dismiss the action against BOAA for lack of personal jurisdiction. Defendants also filed a motion to vacate the temporary restraining order on May 9, 1994. All of these motions were made returnable on May 11, 1994.

## Discussion

In their response to defendants' motions, plaintiffs have asserted that the Court lacks subject matter jurisdiction over this action and must therefore remand the action back from whence it came. Because the removal statute only allows removal of actions within the Court's original jurisdiction, 28 U.S.C. § 1441, and because fundamental principles of American jurisprudence forbid the Court from acting in the absence of subject matter jurisdiction, *see W.G. v. Senatore*, 18 F.3d 60, 63 (2d Cir.1994) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 173–80, 2 L.Ed. 60 (1803) and noting that in the absence of jurisdiction, "the district court has 'no power to do anything but to strike the case from the docket.' *The Mayor v. Cooper*, 73 U.S. (6 Wall.) 247, 250, 18 L.Ed. 851 (1868)"), plaintiffs' contention must be examined before any other matter.

### 1. Diversity

■ As their first basis of jurisdiction, defendants allege diversity. The Court's diversity jurisdiction is set out generally in 28 U.S.C. § 1332. In this case, the arguably applicable provision is § 1332(3), which grants district courts diversity jurisdiction in cases which are between "citizens of different States and in which citizens or subjects of a foreign state are additional parties."[3]

Plaintiffs offer several reasons why diversity jurisdiction is lacking in the present case. First, they argue, there is not complete diversity here because the alien parties on opposite sides of the caption are from the same foreign state. Plaintiffs rest this argument upon a 1983 decision where a judge of this Court held that "the requirement of complete diversity applies with the same force and effect to 'additional parties' under § 1332(a)(3)," with the result that diversity jurisdiction cannot exist when aliens from the same state are on both sides of a case. *De Wit v. KLM Royal Dutch Airlines, N.V.*, 570 F.Supp. 613, 617.

Acknowledging plaintiffs' accurate reporting of the *De Wit* case, and with all due respect to the *De Wit* court, I decline to follow that decision. Virtually all of the authorities that have considered the question hold that in cases where there are citizens and aliens on both sides of a case, jurisdiction exists under § 1332(a)(3) so long as there is complete diversity among the citizen parties and the citizen parties are legitimately involved in the underlying controversy and not present merely to establish federal jurisdiction. *See Transure, Inc. v. Marsh and McLennan, Inc.*, 766 F.2d 1297, 1298 (9th Cir.1985); *Camper & Nicholsons International, Ltd. v. Blonder Marine & Charter, Inc.*, 793 F.Supp. 318, 320 (S.D.Fla.1992); *Clark v. Yellow Freight System, Inc.*, 715 F.Supp. 1377, 1378 (E.D.Mich.1989); *K & H Business Consultants Ltd. v. Cheltonian, Ltd.*, 567 F.Supp. 420, 424 (D.N.J.1983); 13B Charles Wright, et al., *Federal Practice and Procedure* § 3604, at 390–391 (1984) ("Wright"); 1 James Moore, et al., *Moore's Federal Practice* ¶ 0.75 [1.–2–4], at 800.44–800.47 (1991) ("Moore"). While this Court

---

**2.** The Temporary Restraining Order has remained in effect pursuant to 28 U.S.C. § 1450. Pursuant to defendants' telephonic application, the Court modified the Temporary Restraining Order on April 28, 1994 to allow defendants to file already-prepared affidavits in the Australian Court, as required by that court's scheduling order. The modification was granted upon a finding that said filing would not provide a basis for the issuance of any order by the Australian court without future filings which remain enjoined.

**3.** Of course, cases falling within this provision must also satisfy the $50,000 jurisdictional minimum for diversity jurisdiction to exist. 28 U.S.C. § 1332(a).

has never expressly reached that result, it has implicitly assumed it to be the law on at least two occasions. *See L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 126 (S.D.N.Y.1988); *Coudert Brothers v. Easyfind International,* 601 F.Supp. 525, 526 (S.D.N.Y.1985).[4]

Aside from *De Wit,* there is no authority in support of engrafting a requirement onto § 1332(a)(3) that alien parties on opposite sides of a case be from different foreign nations.[5] The leading authorities have rejected the idea, *see* Moore ¶ 0.75 [1.–2–4], at 800.45–800.46; Wright § 3604, at 389 n. 20 (labeling the holding of *De Wit* "dubious"), and it is unsupported by logic. The raison d'etre of diversity jurisdiction is to guard against the possibility that state court judges will treat litigants from the forum state more favorably than out-of-state adversaries.[6] Complete diversity among citizen parties is required, at least in part, because the presence of litigants from the forum state on both sides of the case eliminates the concern that one side will be treated more favorably than the other on the basis of home-state bias. This rationale clearly does not extend to justify a complete diversity requirement with respect to alien parties. Consider a case

brought in New York state court where a citizen of New York and a citizen of Lithuania sue a Texan and a co-defendant. If the co-defendant is a New Yorker, the Texan's fear of bias will be allayed—for in order to penalize the Texan the judge will have to harm one of his or her neighbors. On the other hand, if the co-defendant is a Lithuanian, the nervous Texan will be little comforted—he or she has no reason to think that the judge will be any less willing to penalize a Texan and a Lithuanian than to penalize a Texan alone. For diversity purposes, an alien is an alien is an alien. Thus, the fact that aliens on opposite sides of a case hail from the same country has no bearing on the existence of diversity.

■ Plaintiffs' second argument against diversity rests upon defendants alleged contention that the two alien entities are the principal adverse parties in the present dispute. As just referenced above, it is indeed a requirement of § 1332(a)(3) jurisdiction that the citizen parties be legitimate parties to the underlying controversy and not mere "window dressing." Moore ¶ 0.75 [1.–2–5], at 800.47. Thus, if it were the case that BOA and BNY were not genuinely involved in this

---

**4.** A number of cases in this circuit state that the presence of aliens on both sides of a dispute defeats diversity jurisdiction. *See International Shipping v. Hydra Offshore, Inc.,* 875 F.2d 388 (2d Cir.1989); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 790 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *ITT v. Vencap Ltd.,* 519 F.2d 1001, 1015 (2d Cir.1975). However, in all of these cases, there were no citizens on the plaintiff's side of the caption. The cases, therefore, are most appropriately read as standing for the proposition that the diversity jurisdiction does not encompass cases between foreigners on one side and foreigners and citizens on the other. "The point was not so much that there were foreigners on both sides—for this is permitted by [§ 1332](a)(3)—as that there was no citizen on one side, which took it out of (a)(3); and (a)(2), when read in light of (a)(3), does not permit a suit between foreigners and a mixture of citizens and foreigners." *Allendale Mut. Ins. v. Bull Data Systems,* 10 F.3d 425, 428 (7th Cir.1993).

**5.** The holding in *De Wit* was premised on two decisions, one decided before § 1332(a)(3) was even passed (*Ex Parte Edelstein,* 30 F.2d 636 (2d Cir.), *cert. denied,* 279 U.S. 851, 49 S.Ct. 347, 73 L.Ed. 994 (1929)), and the other (*Ed & Fred, Inc.*

*v. Puritan Marine Ins. Underwriters Corp.,* 506 F.2d 757, 758 (5th Cir.1975)) superseded by a later decision. *Goar v. Compania de Vapores,* 688 F.2d 417 (5th Cir.1982).

The other cases cited by defendants, *Allendale Mut. Ins. v. Bull Data Systems,* 10 F.3d 425, 428 (7th Cir.1993) and *Spearing v. National Iron Co.,* 770 F.2d 87, 90 (7th Cir.1985), are wholly unpersuasive on this issue. In *Spearing,* Judge Posner, in a section that was clearly *dicta,* observed that there would be no federal jurisdiction if the sole plaintiff, a Canadian, had named another Canadian as a defendant. This result, however, is mandated by § 1332(a)(2), *see* Moore ¶ 0.75 [1.–2–4], at 800.44, and has no bearing on the construction of § 1332(a)(3). *Allendale,* in still more *dicta,* relies on *Spearing* to support an offhanded remark to the effect that aliens from the same state on opposite sides of a case destroy diversity. There is no indication of which subdivision of § 1332 Judge Posner is referring to in this statement, nor is there any analysis on the point.

**6.** "It is the generally accepted view that diversity jurisdiction was established to provide access to a competent and impartial tribunal, free from local prejudice or influence, for the determination of controversies between citizens of different states." Moore ¶ 0.71 [3.–1], at 709.

dispute, diversity jurisdiction would not lie. Further, if it were the case that BOA had unequivocally asserted that BOA and BNY were not legitimate parties to this action, BOA might well be estopped from contending the opposite to secure jurisdiction. However, the Court is unable to say on the record as it stands that either of those cases is this case. First of all, as the complaint in this action makes clear, both BOA and BNY were consistently involved in the disputed transaction. Complaint ¶¶ 6, 11, 12, 14, 15, 17, 19 and Exhibits A–C. While the level of their involvement is not perfectly clear, it appears that it at least rises above that of the citizen parties in *L'Europeenne de Banque, supra,* cited by plaintiffs, where the Court found that the citizen parties had never dealt directly with the alien parties and had been named because they possessed assets against which plaintiffs hoped to execute a judgment.

With respect to previous positions taken by defendants, despite plaintiffs' insistence to the contrary, there is nothing in defendants' briefs or affidavits which can be taken as a clear statement that BOA and BNY were not substantially involved in the disputed transaction or have no interests at stake in this action. Accordingly, plaintiffs' second argument against diversity fails.

■ Plaintiffs' final argument is that there is not complete diversity because BOA and BNY may both be considered citizens of New York. BNY, as a New York corporation with its principal place of business in New York, is clearly a citizen of New York. 28 U.S.C. § 1332(c)(1). BOA is a national banking association, with its principal place of business in San Francisco, California. Under 28 U.S.C. § 1348, it is a citizen of the States in which it is located.[7] Plaintiffs argue that because BOA maintains a building and an office in New York, it is located in, and is a citizen of, New York. Of course, if this is true, there is no diversity. Defendants ar-

gue that, under § 1348, a national banking association is only "located" where it maintains its principle place of business (and is thus only a citizen of that state). Under the loosest reading of the statute, they say, BOA may not be labeled a citizen of every state in which it maintains offices but only of those states in which it maintains branch banks.

Research does not disclose any case above the district court level in which a court has construed the meaning of "located" in § 1348. The leading case on the issue appears to be *Connecticut Nat. Bank v. Iacono,* 785 F.Supp. 30 (D.R.I.1992), in which the Court, relying on *Citizens & Southern National Bank v. Bougas,* 434 U.S. 35, 98 S.Ct. 88, 54 L.Ed.2d 218 (1977), held that under § 1348, a national banking association is located in, and therefore a citizen of, every state in which it maintained branch banks.

In *Bougas,* the Supreme Court considered the meaning of "located" as used in 12 U.S.C. § 94, which prescribes venue for suits against national banking associations ("NBA"). Section 94, at the time, provided that a federal court action against a NBA had to be brought in the judicial district where the NBA was "established" and a state court action against a NBA had to be brought in the county or city where the NBA was "located." Recognizing that "established" and "located" were not synonymous, the Court endeavored to find "the reason behind the distinction in the words." 434 U.S. at 44, 98 S.Ct. at 93. The Court ultimately concluded that Congress' intention in restricting state court suits against NBAs to the city or county in which they were located was to avoid the "untoward interruption of a [NBA's] business that might result from compelled production of bank records for distant litigation." *Id.* The Court then reasoned that allowing banks to be sued where they maintained branch offices did not implicate this concern, particularly in view of mod-

---

7. Section 1348 provides:

The district courts shall have original jurisdiction of any civil action commenced by the United States or by direction of any officer thereof, against any national banking association, any civil action to wind up the affairs of any such association, and any action by a banking association established in the district

for which the court is held, under chapter 2 of Title 12, to enjoin the Comptroller of the Currency, or any receiver acting under his direction, as provided by such chapter.

All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the states in which they are respectively located.

ern methods of data processing and transportation.[8] Accordingly, it held under § 94 that a NBA was "located" wherever it maintained a branch.

In *Iacono*, the Court offered several reasons in support of applying the Supreme Court's construction of the word "located" in the former § 94, to the word "located" in § 1348. First of all, in *Bougas*, the Court expressly noted that "located" appeared in two other federal banking statutes, including § 1348, suggesting that the Court may have viewed its construction as valid for all three statutes. Second, like § 94, § 1348 also contains the word "established" in one paragraph and the word "located" in another. This calls to mind the Supreme Court's admonition that there is a difference between those words and counsels against reading them as synonymous. Third, expanding the citizenship of NBAs to include the locations of their branch offices is consistent with the modern trend of construing the diversity jurisdiction narrowly so as to relieve the congestion of the federal courts.[9] Finally, and perhaps most importantly, subsequent to *Bougas*, Congress amended § 94 to specify that venue in actions against NBAs lies in the district, county, or city "in which [the NBA's] *principal place of business is located.*" 12 U.S.C. § 94 (emphasis added). Clearly, this indicates that Congress appreciated the *Bougas* holding and knew how to supplant it. The fact that Congress did not similarly amend § 1348 suggests that it was prepared to accept the *Bougas* construction of "locat-

ed" for § 1348, particularly in view of the fact that *Bougas* expressly referenced that statute. *Iacono*, 785 F.Supp. at 33–34. All of these things persuade me that *Iacono* was correct in relying on *Bougas* to hold that under § 1348 a NBA is a citizen of all states in which it has branches.[10]

Defendants contend that even if the Court reads § 1348 to make BOA a citizen of all states in which it has branches, the Court should not extend the statute further to make it a citizen of all states in which it maintains offices.[11] The significance of the distinction here is that while BOA maintains an office in New York, it does not maintain a branch. Accordingly, if defendants' contention is sustained, it is not a citizen of New York and complete diversity exists.

The Court cannot sustain defendants' argument because it can perceive no distinction between branches and offices relevant to determining the citizenship of an NBA under § 1348. Defendants offer no authority or rationale to support the conclusion that Congress intended NBAs to be "located" only in places where they maintain offices "at which deposits are received, or checks paid, or money lent." 12 U.S.C. § 36. The more natural reading of "located" is that it includes any place where a NBA maintains a substantial presence. This reading comports with traditional notions of jurisdiction as tied to presence within the forum.[12] *See International Shoe v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Addi-

**8.** As the Court observed, § 94 was passed in 1864. At that time, a bank's location and the site of its establishment were one and the same. Branch banks were not yet contemplated.

**9.** Also relevant on this point is the fact that § 1348, as first adopted in 1882, was intended to limit NBA's access to federal courts. *See Herrmann v. Edwards*, 238 U.S. 107, 35 S.Ct. 839, 59 L.Ed. 1224 (1915) (explaining that § 1348's initial precursor was designed to prevent NBAs from using the fact that they are charted under a federal statute as a basis to claim federal question jurisdiction for all cases in which they are involved).

**10.** In addition, I note that had Congress intended to limit the citizenship of NBAs to the states of their principal places of business, it could easily have incorporated into § 1348 the language of

§ 1332(c)(1), which adopts that standard for determining the citizenship of corporations generally.

**11.** 12 U.S.C. § 36 defines a "branch" as

any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

**12.** The Court recognizes that the question of where a NBA can be deemed a citizen under § 1348 is different from the question of where it is subject to personal jurisdiction. Nevertheless, because the purpose of evaluating a NBA's citizenship is to determine the existence of diversity jurisdiction, traditional notions of jurisdiction are relevant.

tionally, this construction is consistent with the general policy of narrowing diversity jurisdiction and the specific purpose of § 1348 to restrict NBAs' access to federal courts. *See, infra,* p. 11–12.

It is true that *Bougas* and *Iacono* both hold that, other than the site of its principal place of business, a NBA is located where it maintains *branches.* This, however, is most likely a result of the circumstance that the courts in those cases were presented with facts in which the NBA office claimed to support citizenship was a branch. Neither court indicated that any particular characteristic unique to a branch, as distinguished from any other form of bank office, was important to its holding.[13]

If substantial presence is to be the test for citizenship, certainly BOA meets it with regard to New York. I need go no further than to observe that BOA maintains offices on Madison Avenue, in a office tower bearing its own name, to demonstrate that BOA's presence here is indeed significant. BOA must therefore be deemed a citizen of New York under § 1348, and because BNY is also a citizen of New York, diversity jurisdiction is defeated.

### 2. International Banking Jurisdiction

As an alternative basis of jurisdiction, defendants allege 12 U.S.C. § 632, which provides for original federal jurisdiction over

all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking ... or out of other international or foreign financial operations, either directly or through the agency, ownership, or control

of branches or local institutions ... in foreign countries.

As evident from the text of the § 632, in order for it to apply (1) one of the parties to a suit must be a federally chartered corporation, and (2) the suit must arise out of a transaction involving international or foreign banking or financial operations.

The parties' argument on the availability of § 632 jurisdiction has focused exclusively on the second element.[14] BOA maintains that because the action here stems from a failed purchase of loans by its foreign subsidiary, it arises out of a transaction involving foreign banking. The purchase of loans, BOA claims, is banking activity. BNY, while not challenging the foreign character of the dispute, argues that the action is essentially contractual and that the nexus to banking is too tenuous to support § 632 jurisdiction.

■ In general, courts have interpreted § 632 narrowly.[15] *See Telecredit Service Center v. First Nat. Bank,* 679 F.Supp. 1101, 1103 (S.D.Fla.1988). The Second Circuit has cautioned that courts must carefully examine the nature of the transaction said to ground § 632 jurisdiction. *See Corporacion Venezolana de Fomento v. Vintero Sales Corporation,* 629 F.2d 786 (2d Cir.1980). As Judge Wood has observed, "a district court cannot find that it has § 632 jurisdiction merely because there was a federally chartered bank involved, there were banking-related activities, and there were foreign parties." *Lazard Freres & Co. v. First National Bank of Maryland,* 1991 WL 221087, at 2, 1991 U.S.Dist. Lexis 14665, at 3–4 (S.D.N.Y.1991). Rather, a Court should satisfy itself that the suit arises out of an international or foreign transaction which falls within the realm of those "characterized as traditional banking activities." *Telecredit,* 679 F.Supp. at 1103.

**13.** *United Apparel Distribs. v. Chase Manhattan Bank, N.A.,* No. 80–CV–1155, slip op. (N.D.Ill. Aug. 4, 1980), cited by defendants for its holding that a bank is not located in a state unless it maintains a branch there, simply assumed the holding of *Bougas* to be that banks are only located where they have branches and did not offer any analysis as to why this should be so.

**14.** Because BOA is organized under the laws of the United States, there is no dispute that the first element is satisfied.

**15.** Because defendants are using § 632 as a basis of removal, it is relevant to note that removal statutes are also construed narrowly, with doubts resolved against removability. *See Contitrade Services Corporation v. Eddie Bauer Inc.,* 794 F.Supp. 514, 516 (S.D.N.Y.1992).

This action, insofar as it arises out of a failed loan purchase and sale transaction, appears initially to meet that standard. As BOA argues, the purchase and sale of loans is widely considered to be "banking." Under 12 U.S.C. § 24(7), national banks are expressly given the power to "carry on the business of banking ... by discounting and negotiating ... evidences of debt." *See also First Nat'l Bank v. Hartford*, 273 U.S. 548, 560, 47 S.Ct. 462, 466, 71 L.Ed. 767 (1927) (powers of national banks encompass the acquisition and sale of mortgages and "other evidences of debt"). The Office of the Comptroller of the Currency, which is charged with the regulation of national banks, has promulgated specific guidelines for such transactions, in which the "purchase and sale of loans" are described as "established banking practices." Comptroller of the Currency, Banking Circular 181, [Current] Fed.Banking L.Rep. (CCH) ¶ 66,799, at 38,858 (Aug. 2, 1984).

Nevertheless, this case is different from others in this circuit where § 632 jurisdiction was found, most of which concerned either a dispute over a bank's obligations under a letter of credit [16] or a claim that a bank has wrongfully dishonored a draft or otherwise improperly refused to pay out funds on deposit.[17] The claims in those cases were integrally tied to banking activity, such that the courts were required to consider and apply principles of banking law to resolve them. This case, by contrast, presents no banking law issues. Despite its appearance of having arisen from a failed banking transaction, the case is essentially contractual and presents only the most elementary contract law issue: Did the parties reach a binding agreement?

I conclude that the lack of banking law issues in the case brings it outside the scope of § 632. On its face, the statute only requires that a case arise out of a transaction involving foreign banking. I interpret this, however, to mean that the banking aspect of the jurisdictional transaction must be legally significant in the case. *Cf. Telecredit*, 679 F.Supp. at 1104. (finding no § 632 jurisdiction where "the nature of the transaction at issue" was "a contractual dispute between the parties"). The opposite interpretation—that a banking transaction need only appear somewhere in the chain of causation—makes federal jurisdiction turn on chance rather than substance. A purely contractual dispute over a failed loan sale would be a federal case, but the same dispute involving a sale of repossessed automobiles would not. Unless the fact that loans were involved in the first hypothetical case has some bearing on its legal posture, the distinction makes no sense. Moreover, this interpretation confers jurisdiction on virtually any case where a bank is involved on account of the regular conduct of its business. Concededly, that is a plausible reading of § 632, but if "Congress had intended to reach all cases in which a bank is a party ... it could have stated its intent more easily." *Diaz v. Pan American Federal Savings and Loans Assn'*, 635 F.2d 30, 32 (1st Cir.1980).

## Conclusion

The Court having found that it lacks subject matter jurisdiction, the case is REMANDED to the Supreme Court of the State of New York. However, because I find that this order involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of this litigation by permitting defendants' fully submitted motions to proceed expeditiously in this court in the event remand is found improper, the remand

---

16. *E.g., All Service Exportacao v. Banco Bamerindus*, 921 F.2d 32 (2d Cir.1990); *First Nat. Bank of Boston v. Banco Nacional de Cuba*, 658 F.2d 895 (2d Cir.1981); *Bank of Canton, Ltd. v. Republic Nat. Bank of New York*, 636 F.2d 30 (2d Cir.1980); *Corporacion Venezolana, supra; Contitrade Services Corporation, supra.*

17. *E.g., Wells Fargo Asia Ltd. v. Citibank, N.A.*, 936 F.2d 723 (2d Cir.1991); *Papadopoulos v. Chase Manhattan Bank, N.A.*, 791 F.Supp. 72 (S.D.N.Y.1990); *Ossandon v. Swiss Bank Corporation*, No. 87 Civ. 0991, 1988 WL 138124 (S.D.N.Y. Dec. 15, 1988); *Phung Thi Bao v. Bank of America*, No. 84 Civ. 6013, 1986 WL 1807 (S.D.N.Y. Feb. 3, 1986).

order is STAYED and CERTIFIED for immediate appeal under 28 U.S.C. § 1292(b).[18]

---

18. As defendants concede, there are conflicting authorities on the eligibility of orders of remand for lack of subject matter jurisdiction for certification under § 1292(b). *See Ryan v. Dow Chemical Co.,* 781 F.Supp. 934, 952 (E.D.N.Y.1992) (citing cases). This too, I find to be an issue suitable for appellate consideration.