## In re LLOYD'S AMERICAN TRUST FUND LITIGATION.

### No. 92 Civ. 1262 (RWS).

United States District Court,
S.D. New York.

June 7, 1996.

Camhy Karlinsky & Stein, New York City (Kenneth A. Lapatine, Mark H. Budoff, of counsel), Milberg Weiss Bershad Hynes & Lerach, New York City (Sanford P. Dumain, of counsel), for Plaintiffs.

Shearman & Sterling, New York City (Frederick T. Davis, Donald A. Goldsmith, Henry Weisburg, of counsel), Debevoise & Plimpton, New York City (John H. Hall, of counsel), for Defendant.

## OPINION

SWEET, District Judge.

Plaintiffs Gasper Celamo, Michael Montana, and John Norton, plaintiffs in three class actions, have moved to remand the actions which have been removed by defendant Citibank, N.A. ("Citibank") from the Supreme Court of the State of New York. The motion is denied for the reasons set forth below.

### The Parties

Each of the named plaintiffs is a citizen and resident of the United States and seeks to represent a proposed plaintiff class of citizens for each of whom at least one trust fund was to be maintained in the United States with Citibank as trustee and fiduciary (the "Plaintiffs").

The plaintiffs and proposed plaintiff class members are an underwriting members of Lloyd's of London ("Lloyd's"), known as "Names." Each accepts insurance risks by participating in underwriting syndicates under various agreements described in greater detail below. Each Name is responsible solely for his or her share of any claims, and his or her assets may not be reached to satisfy the obligations of any other Name.

Citibank, a national banking association with its principal place of business in New York, is a trustee under the trust agreements described below and individually as a fiduciary under New York law.

### Prior Proceedings

#### I. The New York Action

On December 29, 1995, two of the present actions were commenced by filing of summonses and complaints in the Supreme Court of the State of New York, County of New York, captioned Celauro v. Citibank, N.A., (Index No. 60139/95) and Montana v. Citibank, N.A., (Index No. 601040/95). These actions were subsequently consolidated under the caption In re Lloyd's American Trust Fund Litigation, (Consolidated Index No. 661039/95) by stipulation and order dated January 23, 1996. The third action, Norton v. Citibank, N.A., (Index No. 600692/96), was commenced on February 9, 1996, and made a part of the consolidated proceedings.

On or about February 21, 1996, Citibank filed a Notice of Removal, removing the actions to this Court. The sole basis set forth in the Notice of Removal for subject matter jurisdiction in the federal court was the Edge Act, 12 U.S.C. § 632 ("Section 632").

The instant motion to remand was filed by the Plaintiffs on April 6, and affidavits were filed in opposition to the motion describing the agreements and activities at issue. The motion was argued on April 17, 1996, at which time it was considered fully submitted.

#### II. The California Action

On February 21, 1996, the California Commissioner of Corporations, on behalf of all Names resident in California, filed suit against Lloyd's, Citibank as trustee of the Lloyd's American Trust Fund ("LATF"), and a number of other Lloyd's-related entities in the Superior Court of California for the County of Los Angeles by filing a summons and complaint captioned People of the State of California v. Lloyd's of London, et al., Case No. BC144755 (the "California Complaint"). The California Complaint asserted various violations of state securities laws and sought, among other relief, a temporary restraining order imposing an equitable lien on the LATF and a freeze of all funds in the LATF. The Complaint requested the same relief in the form of a preliminary injunction.

On February 27, 1996, Citibank, one day after being served, removed the action to the District Court for the Central District of California in Los Angeles, on the ground that, since the Complaint sought relief against the LATF and Citibank as trustee of the LATF, the lawsuit arose out of transac-

tions involving international or foreign banking and also arose out of international or foreign financial operations. The case was subsequently assigned to the Honorable Terry J. Hatter.

On March 4, 1996, the Commissioner of Corporations filed a motion for remand asserting, *inter alia*, that the involvement of the LATF and Citibank in the lawsuit did not sufficiently implicate Section 632 for the purposes of establishing federal jurisdiction. On March 15, 1996, Judge Hatter denied the Commissioner's motion. *See People of the State of California v. Lloyd's of London, et al.*, CV 96–1357 (C.D.Cal. March 15, 1996).

### The Complaint

As set forth in the Complaints, the Plaintiffs and the class allege that Citibank breached its duties and responsibilities as the trustee of the trust fund of each plaintiff. It is alleged, *inter alia*, that Citibank engaged in a pattern of transferring money from the trust funds maintained by solvent Names to trust funds of insolvent Names in order to meet the latters' obligations, that Citibank engaged in unauthorized commingling of the funds in different trust funds, and that Citibank failed to maintain appropriate and necessary records with respect to each trust fund.

Specific allegations of improper activities include: improper loans and overdrafts (Comp. ¶¶ 60, 62, 64, 70, 71, 72, 102, 105, 109, 110, 114); improper transfers of money (Comp. ¶¶ 19(b)(vii), 86, 104, 107, 115); failure to establish and properly maintain bank accounts (Comp. ¶¶ 10, 45, 49, 52, 96, 103); improper investment of account funds (Comp. ¶¶ 47(f), 48); breaches of fiduciary duty (Comp. ¶¶ 96, 104, 106, 107, 115, 116); failure to render reports and accountings of bank accounts at Citibank (Comp. ¶¶ 11, 84, 93, 99); and violations of regulations issued by the Comptroller of the Currency that specifically govern banks (Comp. ¶ 19(b)(xii)).

Based on these alleged breaches and wrongful conduct, the plaintiffs seek an accounting by Citibank as to each trust fund, recovery of any damages suffered as a result of Citibank's breaches of its fiduciary and contractual duties, and an injunction enjoining Citibank from continuing to commit any breaches of the fiduciary and contractual duties owed to the plaintiffs and members of the plaintiff class.

### The Facts

The facts as set forth below are derived from the complaint and the unrebutted affidavits submitted in opposition to the motion describing the activities of the Plaintiffs, Lloyd's and Citibank, and certain of the agreements relevant to their relationships.

Lloyd's is a unique and complex insurance market that has been operating in London for more than 300 years. In 1971, the Society and Corporation of Lloyd's (the "Corporation") was established by an Act of the British Parliament.

Lloyd's is not itself an insurer, but a market for insurance. It is the individual underwriting members of Lloyd's, the Names, and, since 1994, a limited number of corporate members, who are the insurers and who underwrite insurance through groups called syndicates.

In 1995, nearly 15,000 individual Names from more than fifty countries were actively engaged in underwriting at Lloyd's. Of those active Names, approximately 85 percent were British subjects; only five percent were American citizens on whose behalf these class actions have been brought. Since 1969 (when persons other than British subject were first permitted to become Names), U.S. Names have accounted for approximately ten percent of a total number of Names, or more than eight percent of the Lloyd's market's aggregate premium income (the aggregate amount of gross premium income earned by all Names).

The syndicates through which Names underwrite insurance are managed by underwriting agents known as Managing Agents, to which the Names in the syndicate each delegate the authority to select risks, set premium rates, hold premiums and pay claims on their behalf. Names, in consultation with their representative at Lloyd's, who is known as a Members' Agent, select the syndicates in which they are to participate in any particular underwriting year of account. Names generally underwrite through more

than one syndicate in order to diversify their risk by spreading their underwriting across different types of insurance, different syndicate managers and different currencies. Because of this diversification, most U.S. Names underwrite a substantial amount of non-U.S. business in U.S. dollars, as well as non-U.S. currency; correspondingly, non-U.S. Names underwrite a substantial amount of insurance written in U.S. dollars.

To provide assurance to policy holders that their valid claims will be paid, Lloyd's participants have over time developed a so-called "chain of security" designed to ensure that there will be sufficient financial resources to provide claims payment security for policyholders.

In order to qualify for membership in Lloyd's, a Name must demonstrate that he or she has sufficient assets to pass a "means test." A Name is further required to provide security with respect to his or her underwriting business at Lloyd's in the form of a "Lloyd's Deposit," which may include cash, investments, guarantees or letters of credit and is held pursuant to the Lloyd's Deposit Trust Deed or the Lloyd's Security and Trust Deed. In addition, all active Names must also pay annual levies to the Central Fund for the current year of account. The Central Fund is available as a means for Lloyd's to, among other things, "mak[e] good any default by any [Name] under any contract of insurance underwritten at Lloyd's, [and] preven[t] the occurrence or reduc[e] the extent of such default by any [Name]."

One key element at issue in these actions is the establishment of "premium trust funds". Pursuant to the U.K. Insurance Companies Act of 1982, all premiums relating to a Name's underwriting must be placed into a trust fund established in accordance with the provisions of a trust deed approved by the U.K. Secretary of State for Trade and Industry. Accordingly, all premiums paid by policyholders are deposited in one of three Lloyd's trust funds, depending on the currency in which the premiums are paid. The Lloyd's American Trust Fund ("LATF") and the Lloyd's Canadian Trust Fund receive all premiums payable in American and Canadian dollars, respectively. All other premiums received are held in the Lloyd's Premiums Trust Fund. All of the allegations of the Complaints refer to the LATF.

The LATF was created in August 1939, through an initial deposit with the City Bank Farmers Trust Company to protect policyholders in the United States from the consequences of German attacks on England. The New York Department of Insurance regulations that govern the LATF emphasize that this trust fund serves to protect policyholders: "the trust fund is for the exclusive protection of all direct policyholders and beneficiaries of direct policies covering property or risks located within the United States." N.Y.Comp.Codes R. & Regs. tit. 11 vol. A, § 27.13(h)(1) (1995). The reinsurance regulations covering the LATF require the maintenance of a "trust fund ... for the protection of United States ceding insurers and United States beneficiaries under reinsurance policies." N.Y.Comp.Codes R. & Regs. tit. 11, vol. B, § 125.4(d)(1)(iv) (1995). The trust fund constitutes a vehicle to segregate certain funds to insulate them from other funds held by the Names as insurers. Citibank and its corporate predecessors have been the trustees of the LATF since its inception. As of January 31, 1996, Citibank held approximately $12.3 billion in LATF assets.

The LATF operates pursuant to the terms of the Lloyd's American Trust Deed (the "Deed"). The Deed states that the LATF "shall enure for the benefit of all policyholders" and provides a means for policyholders to enforce unsatisfied claims.

The Deed provides that the principal of the LATF shall comprise, among other funds, all premiums and other amounts paid in connection with "American Business." American Business is broadly defined as Lloyd's policies on which both premiums and claims are payable in United States dollars. Because Lloyd's writes large amount of dollar-denominated business outside the United States, premiums relating to a substantial amount of Lloyd's business that have no direct connection with either United States policyholders or United States Names are deposited into the LATF. For example, a Lloyd's policy insuring a Russian airliner or a Japanese

ship may well be stated and paid entirely in American dollars, in which event the premiums must be paid into the LATF, even though neither the Names underwriting that policy, the insured, or the situs of risk is located in the United States. In total, approximately fifty-eight percent of the policies written in the Lloyd's market call for premiums and claims to be paid in U.S. dollars. Forty-eight percent of this American Business is related to non-U.S. situs insurance risks.

Because the premiums and the payments under many international insurance policies are stated in U.S. dollars, even if they have nothing to do with the United States, the LATF is intended to assure policyholders around the world that their valid claims will be paid.

Under the terms of the Deed, Citibank does not take direction from, communicate with, or account to, the Names. It is exclusively required to act in accordance with "directions" it received from the "Agent" for the Names. The Agent is defined in the Deed to include the Names' Members' Agents, the Names' Managing Agents, and the "representative of the Agent" (that is, a person designated by an Agent). In practice, Citibank receives instructions on a day-to-day basis from the "Representative of the Agent," who may be any of several designated staff members of the Market Financial Services Department ("MFS") within the Corporation of Lloyd's in London. MFS carries out certain financial functions on behalf of the participants in the Lloyd's market, including oversight and coordination of LATF operations.

None of the accounts maintained for the LATF is held in the name of the Names. The accounts are opened by agents of syndicates or groups of syndicates; each account holds funds relating to syndicates in which many Names from all over the world have an interest, and most Names have interests in syndicates with funds in several accounts with the LATF, as well as with the other premiums trust funds.

The MFS staff in London is in contact with Citibank many times each day to provide directions for the management of the LATF, including the crediting of the premiums received and the debiting of claims paid to particular accounts within the fund. The MFS staff instructs Citibank to make these credits and debits to particular accounts within the LATF based upon information supplied by MFS by the departments within the Corporation of Lloyd's that are responsible for the collection of premiums and the payment of claims.

MFS also instructs Citibank in connection with the "London Market Settlement Process," also known as the "London Market Scheme." The London Market Scheme is a settlement system that operates among all the underwriters in the London market, including the Names and their syndicates, with respect to the receipt of premiums and the payment of insurance claims to policyholders.

Premiums received and claims paid are transferred through the London Market Scheme (on a net basis) through clearing house banks in London on a weekly basis. MFS in London calculates the net of premiums to be received and claims to be paid in a given week by Lloyd's Names and their syndicates. Once the net weekly sum has been determined, Citibank, as the LATF trustee, receives or remits from the appropriate accounts the net amount of United States dollars, as required, through the London clearing house bank. If in any particular week, the total amount of Lloyd's premiums collected in U.S. dollars in the London Market Scheme exceeds the amount of the claims to be paid by the Lloyd's syndicates in U.S. dollars, Citibank, upon instruction from the MFS staff, credits the excess to the proper accounts within the LATF and debits the clearing house bank in London for the amount of the excess. If the amount of the claims that must be paid in U.S. dollars exceeds the amount of the premiums collected in U.S. dollars, Citibank, upon instruction from the MFS staff, credits the clearing house bank in London with the amount required to meet the obligation to pay claims and correspondingly debits the appropriate accounts within the LATF.

In addition, Citibank, upon instruction from the MFS staff in London, pays from the

correct account certain liabilities other than claims, such as syndicate expenses, reinsurance premiums, repayments of bank borrowings and letter of credit payments in connection with claims. In addition, Citibank, at the direction of the MFS staff, also invests the principal of the accounts within the LATF in various short, medium or long-term instruments on behalf of the Managing Agents whose responsibility it is to invest the assets of the syndicates. Citibank also accounts to the MFS staff in London (i.e., the "Agent") on a daily, weekly, monthly, quarterly and annual basis for investment, regulatory reporting and other purposes on an account-by-account basis.

New York insurance regulations relating to excess line insurance require that a trust fund be maintained in a qualified United States financial institution, and those relating to reinsurance require that a trust fund be maintained in a New York State bank or a member of the Federal reserve System located in New York State. Citibank opens new accounts, engages in transaction for each account, and closes accounts based only on orders received from the MFS staff in London, and its reports are delivered only to the Agents in London by trans-Atlantic communication or transaction.

### SECTION 632 JURISDICTION APPLIES

Section 632 of Title 12 on which Citibank relies to establish federal jurisdiction authorizing removal states as follows:

> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking ... or out of other international or foreign financial operations ... shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suits from a state court into the district court of the United States for the proper district

by following the procedure for the removal of causes otherwise provided by law.

12 U.S.C. § 632 (1994).

### I.  *The Transactions Are International in Nature*

A suit satisfies the jurisdictional requisites of Section 632 if any part of it arises out of transactions involving international or foreign banking. *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981) (finding jurisdiction under Section 632, in an action alleging fraudulent inducement, on the basis of a letter of credit issued by a federally chartered bank no longer party to the suit); *see also Conjugal Soc'y Composed of Juvenal Rosa v. Chicago Title Ins. Co.,* 690 F.2d 1 (1st Cir.1982) (finding jurisdiction under Section 632, though the complaint alleged only fraud, because plaintiff was alleged to have been fraudulently induced to refinance a mortgage).

■ Lloyd's, based in London, is, of course, foreign. The Names who underwrite insurance in Lloyd's Market are citizens of more than fifty countries around the world. The policyholders, too, are widely dispersed throughout the world. The LATF and Citibank are at the heart of the international day-to-day operation of Lloyd's. The LATF is the repository for dollar-denominated premiums which are held in trust to guarantee that policyholders will be paid, and the source for claims payments to holders of dollar-denominated policies. Without the LATF, Lloyd's would not be able to operate and underwrite insurance in the United States, as the Plaintiffs assert.

As found above, Citibank undertakes transactions in respect to the LATF fund in response to instructions received from London. The funds in the LATF are held in trust for policyholders located all over the world and are attributable to underwriting by Names located all over the world, and the premiums forwarded to the LATF and the claims paid from it are processed through the London Market Scheme in London. The Deed which sets forth the terms governing the LATF is international, in that it is exe-

cuted between Citibank in New York (Peter von Kaufmann signing for Citibank) and Lloyd's in London (Lloyd's Chairman, J. David Rowland, signing for Lloyd's).

In this action, the Plaintiffs attack Citibank's conduct as LATF trustee and seek a judgment enjoining Citibank from transferring LATF funds and accepting directions from London. Therefore, this action arises out of international operations, and the relief sought would without question affect those operations.

## II. *The Suit Arises Out of Banking Transactions*

■ Skilled counsel for the Plaintiffs and Citibank have carefully tilled the field of Edge Act jurisdiction to determine what constitutes banking, and all the relevant authorities have been discussed. As a student, albeit not an exceptionally bright one, of *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786 (2d Cir. 1980) ("*CVF* "), *cert. denied* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981), I take that authority as the starting point. There the presence of a defendant bank which had issued a letter of credit at issue supplied jurisdiction under the Edge Act, even though at the time of trial the issuer, Security Pacific International Bank, was no longer a party, having settled. The LATF at issue here in many ways serves a banking function substantially equivalent to the letter of credit function.

Indeed, in *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112 (2d Cir.1984), a credit and security arrangement was at issue in the course of which defendant Chase Manhattan maintained a lock box and collateral account and the transactions cut across the boundaries of two foreign nations. The only Edge Act issue was the choice of law to be applied.

One of the early cases to construe Section 632 upheld the invocation of the statute by a bank (one of Citibank's predecessors) serving as a trustee. *Travis v. National City Bank,* 23 F.Supp. 363 (E.D.N.Y.1938). Trust services constitute a banking activity under federal law. *See* 12 U.S.C. § 92a (1994) (Comptroller of the Currency authorized to permit national banks to act as trustees); *American Legion Post v. First Nat'l Bank & Trust Co.,* 113 F.2d 868, 870 (2d Cir.1940) (former 12 U.S.C. § 248(k), now codified as 12 U.S.C. § 92a(a), authorized Federal Reserve Board "to grant by special permit to a national bank applying therefor the right to act as trustee"); *Palermo v. First Nat'l Bank & Trust Co.,* 894 F.2d 363, 367 (10th Cir.1990) (identifying "loans, discounts, deposits and trust services" as "traditional banking services"); *In re Fidelity Bank Trust Fee Litig.,* 839 F.Supp. 318, 323 (E.D.Pa.1993), *aff'd sub nom. Lewis v. Fidelity Bank,* 43 F.3d 1461 (3d Cir.1994) ("Section 92a gives national banks the right to act as trustees").

Citibank maintains deposits in hundreds of separate bank accounts; keeps account records for those accounts, which it provides pursuant to the Deed on a periodic basis; executes orders to transfer funds to, from and among such accounts; invests funds held in the accounts; and, through the London Market Scheme, funds the settlement of payments (claims) from and deposits (premiums) into the LATF accounts. These constitute international banking services.

The Plaintiffs assert an absence of any "banking law claims," relying upon *Telecredit Serv. Ctr. v. First Nat'l Bank,* 679 F.Supp. 1101, 1104 (S.D.Fla.1988). That case, however, does not require a different conclusion. The *Telecredit* court determined that Section 632 was inapplicable because "sales of travel club memberships" did not "constitute a traditional banking transaction." 679 F.Supp. at 1103–04. The action arose from a fraud committed by two companies in the sale of such memberships in the Bahamas. The fraud was perpetrated on a number of consumers who paid with credit cards. The defendant, a national bank, sought to assert Section 632 jurisdiction based upon the fact that the defrauded consumers had paid for these memberships with credit cards. The court held that the basic dispute was a contract dispute between the two parties that did not implicate any banking activities. In contrast to the allegations here, which relate to Citibank's operating bank trust accounts for the benefit of and on instructions from individuals and entities all over the world,

*Telecredit* was a contract dispute over a fraud in the sale of foreign travel club memberships that simply happened to be purchased by credit card.

In *CVF*, the Second Circuit upheld federal jurisdiction under Section 632 on grounds different from those found by the District Court, a result which hopefully will not be repeated here. There, the action did not seek to hold a party liable for the international or foreign banking transaction upon which the Court based jurisdiction: the bank that was a party to the predicate international or foreign banking transaction was no longer a defendant in the action, and the underlying transaction upon which Section 632 jurisdiction was based occurred entirely within the United States. Other cases have also upheld jurisdiction under Section 632 even though the international or foreign banking activity was not central to the case. *See United Technologies Corp. v. Citibank, N.A.,* 469 F.Supp. 473 (S.D.N.Y.1979) (Section 632 jurisdiction found on basis of letter of credit issued for the benefit of non-party foreigner in action between domestic parties to enjoin domestic bank from acting on letter of credit); *Contitrade Serv. Corp. v. Eddie Bauer, Inc.,* 794 F.Supp. 514 (S.D.N.Y.1992) (distinguishing *Telecredit* and upholding jurisdiction in action based upon one domestic party's failure to honor another domestic party's letter of credit when letter of credit benefitted foreign party); *Wachovia Bank & Trust Co. v. Bankers Trust Co.,* 91 Civ. 3158 (JFK), 1994 WL 75032 (S.D.N.Y. March 4, 1994) (breach of warranty of domestic title action arising from one domestic bank's presentation of a forged check to another domestic bank); *Cutler v. Bank of Am. Nat'l Trust & Savs. Ass'n,* 441 F.Supp. 863 (N.D.Cal.1977) (occurrence of robbery in foreign bank sufficient to establish claims of negligence, fraud, conversion, breach of fraud, breach of warranty and contract, and negligent infliction of emotional distress). *See generally* Robert M. Brill and James J. Bjorkman, *Federal Court Jurisdiction,* 110 Banking L.J. 118, 124 (1993) (noting that *Telecredit* is out of step with other cases applying Section 632).

The principal authority cited by the Plaintiffs in support of remand is *Bank of New York v. Bank of America,* 861 F.Supp. 225 (S.D.N.Y.1994), *permission to appeal denied,* No. 94–8009 (2d Cir. June 8, 1994), in which the Honorable Loretta A. Preska remanded an action in which the defendant asserted Edge Act jurisdiction. Stating that courts have construed Section 632 narrowly and noting the Circuit Court's admonition in *CVF* to examine carefully the nature of the transaction said to ground Section 632 jurisdiction, Judge Preska, citing *Telecredit,* concluded that the issue presented in *Bank of New York* was simply a dispute as to whether or not the parties had reached a binding agreement and that to grant federal jurisdiction there would turn on the character of the parties, rather than the substance of the transaction.

In *Bank of New York,* the Court thus refused to apply Section 632, because the Court characterized as a contract dispute the underlying dispute between the two banks involving a single incomplete purchase of certain assets. Here by contrast the Plaintiffs pose a wide-ranging challenge to multiple, ongoing operations of a complex of bank accounts for which Citibank has served as trustee since 1939, and which benefit policyholders around the world.

The decision in *Bank of New York* is, in any event, inconsistent with the text of Section 632 and with other federal court decisions that have routinely applied Section 632, even in cases based on state law causes of action and containing only an incidental connection to banking law. *See Conjugal Soc'y Composed of Juvenal Rosa v. Chicago Title Ins. Co.,* 690 F.2d 1 (1st Cir.1982) (finding jurisdiction under Section 632 because plaintiffs were alleged to have been fraudulently induced to refinance a mortgage, though complaint was based on allegations of negligence and conspiracy, and hence bore no relationship to banking); *Cutler,* 441 F.Supp. 863 (claims of negligence, fraud, conversion, breach of fraud, breach of warranty and contract, and negligent infliction of emotional distress arising from robbery of safety deposit box in foreign bank); *Puerto Rico v. Eastern Sugar Assoc.,* 156 F.2d 316 (1st

Cir.), *cert. denied,* 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664 (1946) (petition to condemn 3,000 acres of land where bank held mortgage); *Rose Hall Ltd. v. Chase Manhattan Overseas Banking Corp.,* 494 F.Supp. 1139 (D.Del.1980) (breach of contract and breach of fiduciary duty asserted against bank mortgagee of plaintiff).

The test according to the authorities is the existence of "traditional banking activities," *Telecredit,* 679 F.Supp. at 1103, or "that the banking aspect of the jurisdictional transaction must be legally significant in the case." *Bank of New York,* 861 F.Supp. at 233. Here, Plaintiffs urge something of an exercise of over-simplification that the most significant aspect of the dispute is the propriety of the administration of the LATF under New York trust law for the benefit of New York citizens. A more accurate characterization would be the responsibilities of a New York bank administering a fund under an international agreement as part of a worldwide system to finance and settle the funds involved in underwriting insurance by Lloyd's. Perhaps an even simpler conclusion could be reached that having performed the banking functions described above since 1939, it could well be considered traditional today. Under *CVF,* performance of a letter of credit provides Edge Act jurisdiction. The establishment and administration of the LATF, though perhaps greatly more complex than a letter of credit, performs in essence the same banking function. After carefully considering the transaction at issue, and the authorities, it is concluded that the suit arises from banking transactions and that Edge Act jurisdiction applies.

### III. *The Suit Arises Out of International Financial Operations*

Although the nexus of this action to international and foreign banking provides a sufficient basis for federal jurisdiction under Section 632, the jurisdictional requirement is alternatively satisfied, because this suit "aris[es] ... out of other international or foreign financial operations." Indeed, in this context, the plain meaning of the phrase "other international or foreign financial operations" is international or foreign financial operations other than banking. *Travis,* 23 F.Supp. 363 (issuance of securities by corporation constituted foreign financial operations for purposes of Section 632); & Bjorkman, *supra* at 128 ("[I]t is not merely international or foreign 'banking' that triggers jurisdiction under Section 632"); *see also Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) (words in statutes must be given their ordinary, contemporary common meaning).

In any event, under Section 632, jurisdiction may be premised either on the presence in the case of "transactions involving international or foreign banking" or on the presence of "international or foreign financial operations." Even if the transactions in question here do not constitute banking proper, they are so close that they surely fall within the ambit of the "financial operations" contemplated by the statute.

### *Conclusion*

Because Section 632 jurisdiction exists, the motion to remand is denied. Argument on the Defendants' motion to dismiss, which was adjourned *sine die* at the time of oral argument on this motion, will be heard on September 11, 1996.

It is so ordered.