**PARIBAS CORPORATION, Plaintiff,**

v.

**SHELTON RANCH CORPORATION, Robert R. Shelton, Fronie K. Shelton, Shelton Ranches, Inc., SRC Hotels, Inc., SRC Inns, Inc., Shelton Land & Cattle Company, and Shelton Holdings, Inc., Defendants.**

**No. 89 Civ. 5596 (RWS).**

United States District Court,
S.D. New York.

July 6, 1990.

---

Howard, Darby & Levin, New York City, for plaintiff.

Kornstein Veisz & Wedxler by Daniel J. Kornstein, New York City (Brown Maroney & Oaks Hartline, Houston, Tex., of counsel), for defendants.

## OPINION

SWEET, District Judge.

Defendants SRC Hotels, Inc. ("SRC Hotels"), SRC Inns, Inc. ("SRC Inns"), Shelton Holdings, Inc. ("Shelton Holdings") and Fronie K. Shelton ("F. Shelton") (the "12(b) defendants") have moved pursuant to Federal Rule 12(b)(2) of the Federal Rules of Civil Procedure to dismiss the complaint for lack of personal jurisdiction. Defendants Robert R. Shelton ("Shelton"), Shelton Ranches Corporation ("SRC"), Shelton Ranches, Inc. ("Shelton Ranches") and Shelton Land & Cattle Company ("Shelton Land") (the "1404 defendants") have moved pursuant to 28 U.S.C. § 1404(a), to transfer this action on the ground of *forum non conveniens*, to the United States District Court for the Southern District of Texas, Houston Division, or, in the alternative, to the Western District of Texas San Antonio Division. Both motions are denied for the reasons set forth below.

*Parties*

Paribas is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Paribas renders financial advice and provides investment banking services to its clients.

SRC is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Kerrville, Texas.

Defendants Shelton Ranches, SRC Hotels, SRC Inns, Shelton Land and Shelton Holdings are affiliates of SRC and are corporations organized and existing under the laws of the State of Texas with their principal places of business in Kerrville, Texas. Each of the corporate defendants has a common set of officers holding identical positions (Shelton), president, F. Shelton, vice president and secretary, James Bobbitt ("Bobbitt") executive vice president and assistant secretary, Mark Stark ("Stark") treasurer and assistant secretary, Ned Hartline ("Hartline"), assistant secretary.

Robert Shelton is a citizen and resident of the State of Texas, and is the president of each of SRC, SR Inns, SRC Hotels, Shelton Ranches, Shelton Land, and Shelton Holdings. Shelton is the sole director of each of the other corporate defendants.

F. Shelton, is a citizen and resident of the State of Texas and is the spouse of Shelton. F. Shelton is the vice-president and secretary of all of the corporate defendants.

*Prior Proceedings*

Paribas instituted this suit on August 18, 1989. Both the 12(b) defendants and the 1404 defendants (collectively the "Shelton Parties") filed this motion to dismiss on October 20, 1989. After adjournment by the parties this oral argument was heard on March 16, 1990 and the motion was considered fully submitted as of that date.

*Facts*

In 1988, Shelton, a Texas businessperson, developed a project (the "Project") to grow and market "contra-seasonal" apples. Shelton's idea was to grow and harvest apples in Texas in the early summer months in the hope that fresh apples would bring a premium over apples stored for long periods under controlled atmospheric conditions. Shelton proposed to support the Project with existing sugarcane and vegetable operations in Florida. To attract investors to finance the Project, Shelton prepared a brochure and began to contact possible sources of financing throughout the country, including New York.

In the Spring of 1988 Shelton met several times with representatives of Paribas to discuss his proposal. These meetings took place in New York, Florida, and Texas.

*The Agreements*

1. The Engagement Letter

On May 13, 1988, Paribas and SRC signed an engagement letter (the "Engagement Letter") whereby Paribas agreed to identify and contact potential sources of financing and provide other advisory and investment banking services in exchange for the payment of certain fees and the reimbursement of Paribas' out-of-pocket expenses. Shelton also agreed to pay Paribas' attorneys' fees in the event of litigation.

The Engagement Letter specifically provides that any dispute arising out of the agreement shall be governed by New York law, that any such dispute shall be adjudicated in the state or federal courts in the Southern District of New York, and that Shelton consents to service of process by certified mail. The Engagement Letter was signed by Shelton as president of SRC.

The Engagement Letter was negotiated. On May 6, Paribas sent a proposed engagement letter to Shelton and On May 12, the letter, with a number of handwritten changes by Shelton, his executives or his attorney, was telecopied to Paribas for retyping and incorporated in the final Engagement Letter signed by the parties on May 13.

2. The June 17 Term Sheet

In late May and early June, Paribas' officers and representatives toured the proposed orchard sites in Florida and Texas and met with Shelton and his representatives to obtain information regarding Shelton's operations. Paribas alleges that, because of Shelton's financial condition, the financing of the Project would be more difficult than originally anticipated. In early June, Shelton and his executive vice president Bobbitt went to Paribas' office in

New York for two days to continue the discussions.

Paribas' concerns led to a demand for a higher fee agreement and adequate security for its fees and expenses in order to continue to work on the proposal. The negotiations between the parties ultimately led to the signing of a term sheet (the "Term Sheet"), dated June 17, 1988, which described and memorialized the parties' understanding of the proposed venture.

Among other things, the Term Sheet described that the property to be contributed to the proposed partnership included approximately 17,000 acres in Palm Beach County, Florida for the production of sugarcane and vegetables, and approximately 21,750 acres in Texas to be devoted to apple production. The Term Sheet also sets forth the obligations of the parties.

The Term Sheet was signed four times by Shelton, on behalf of himself, SRC, Shelton Land, and Shelton Ranches. The Term Sheet also purports to bind "Senior Shelton Group Members", including F. Shelton and each of the corporate defendants in that the Term Sheet defines "Senior Shelton Group Members" to include F. Shelton, and any entity which she substantially owns. The Term Sheet also discusses that the newly formed subsidiary of SRC was to be the general partner of the Texas Orchards limited partnership. Shelton was to be the Chief Executive Officer of this company and Shelton and F. Shelton were the only named employees. At that time F. Shelton was also an employee of SRC.

The Term Sheet contains choice of law and forum selection clauses identical to those contained in the May 13, Engagement Letter:

> This Term Sheet shall be governed by the laws of the State of New York. Any dispute arising out of this Agreement shall be adjudicated exclusively in the courts of the State of New York, and SRC hereby agrees that service of process upon it by registered mail at the address shown herein shall be deemed adequate and lawful service.

The forum selection clause in the Term Sheet was the subject of discussion and negotiation between the parties. SRC and Shelton promised in the Term Sheet to cause Paribas to be granted a security interest in art work or other collateral with a value of at least $2 million to secure Paribas' fees and expenses.

### 3. June 17 Security Agreement

In response to this last provision in the Term Sheet, the parties contemporaneously signed a guaranty and security agreement (the "Security Agreement") which guaranteed, among other things, payment to Paribas and gave Paribas security in certain works of art, specifically, a Remington painting, "Death of Wascind" owned by Shelton, and a painting by Charles M. Russell, "Free Trader", owned by SRC.

To fully secure Paribas' right to these paintings, the Security Agreement is signed by Shelton seven times, once on his own behalf, and once on behalf of each of the corporate defendants, and by F. Shelton. The Agreement provides that F. Shelton shall not have any personal liability for the obligation; however, each of the signatories, including F. Shelton warrant that the works of art listed are free and clear of any lien and that the Security Agreement creates a valid and perfected security interest in them, prior to any other interest. The June 17 Security Agreement also provides that Paribas' rights are not impaired by the failure of investors to invest or the failure of the deal to go forward.

Moreover, the Security Agreement provides that it is to be governed and construed under New York law. The Agreement states that all notices and communications should be sent to SRC to the attention of Shelton; notice to the other defendants is omitted.

### 4. The Amended Engagement Letter

On June 24, 1988, the parties also signed a letter amending the Engagement Letter (the "Amended Engagement Letter"), which provides for an additional fee to Paribas in the amount of $250,000. The Amended Engagement Letter provides that it will be governed by the internal law of

New York and incorporates the last three paragraphs of the Term Sheet, which include the forum selection clause granting exclusive jurisdiction to the federal and state courts in New York. The Amended Engagement Letter is signed by Shelton on behalf of SRC.

### 5. September 29 Amended Security Agreement

On September 29, 1988 the parties signed an amendment to the Security Agreement (the "Amended Security Agreement") which, among other things, gave Paribas a security interest in eight additional works of art. The Amended Security Agreement again provides that it is to be governed by and construed in accordance with the internal laws of the State of New York. This Agreement is signed by Shelton and F. Shelton personally, and by Bobbitt as executive vice president of each of SRC, Shelton Ranches, SRC Hotels, and SRC Inns.

### 6. September 29 Art Custody Agreement

In connection with the Amended Security Agreement, the Shelton parties also entered into an Art Custody Agreement dated September 29, 1988 which secured Paribas' right to the agreed-upon pieces of art in the Kerrville Cowboy Artist Museum. The Art Custody Agreement relates both to the Security Agreement and Amended Security Agreement. It provides that it shall be governed by the internal laws of the State of New York. It also provides that any dispute relating to the Art Custody Agreement, the Security Agreement or the Amended Security Agreement shall be adjudicated in the federal or state courts of New York. The signatories further agreed to submit to the jurisdiction of the New York courts and affirmatively agreed not to contest New York jurisdiction:

> Each of the Museum and each Grantor hereby agrees (i) that if the Secured Party should so elect, all questions arising among all or any two or more of the parties relating to the Security Agreement or this Amendment shall be resolved by any state or federal court located in the State of New York which the Secured Party may select, (ii) to the jurisdiction of any such court and not to contest (on grounds of forum non conveniens, lack of venue or otherwise) the right of such court to resolve any such issue and (iii) that personal delivery by any person or by return receipt requested registered mail of papers relating to any such court proceeding shall constitute adequate service of such papers on the Museum or any Grantor.

Shelton, F. Shelton, and Bobbitt, on behalf of the corporate defendants, signed the Art Custody Agreement.

### A. Motion to Dismiss is Denied

#### 1. Forum Selection Clauses

■ In this circuit it is well-settled that forum-selection clauses regularly are enforced under the principles the Supreme Court announced in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), and applied to federal jurisdiction cases in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974) and *Stewart Org. Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); *see Luce v. Edelstein*, 802 F.2d 49, 57 (2d Cir. 1986); *Bense v. Interstate Battery Sys. Inc.*, 683 F.2d 718, 721 (2d Cir.1982); *600 Grant Street Assoc. Ltd. Partnership v. Leon-Dielmann Invest. Partnership*, 681 F.Supp. 1062, 1064 (S.D.N.Y.1988); *Karl Koch Erecting Co. v. New York Convention Center Dev. Corp.*, 656 F.Supp. 464, 467 (S.D.N.Y.1987), *aff'd*, 838 F.2d 656 (2d Cir.1988). Forum selection clauses are valid and enforceable consents to jurisdiction in the New York courts. *Luce*, 802 F.2d at 57; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*, 553 F.2d 842, 844 (2d Cir.1977); *In re Ultracashmere House Ltd.*, 534 F.Supp. 542, 545 (S.D.N.Y.1982).

#### 2. The 12(b) Defendants

Each defendant signed at least three of the agreements underlying the transaction: the Security Agreement, the Amended Security Agreement and the Art Custody Agreement. Each contract signed by each

of these defendants contains or incorporates a forum selection clause. In the Art Custody Agreement, defendants not only consented to jurisdiction and to service of process by registered mail, but also affirmatively agreed not to contest jurisdiction and venue in New York. All three contracts also provide a clause stating that the contracts should be governed and construed in accordance with New York law.

Defendants do not contest the validity of the agreements. There is no claim of fraud with respect to the making of the jurisdictional and forum selection clauses of the agreements. The Shelton Parties contest merely the jurisdictional contacts of the 12(b) defendants.

Although the underlying dispute may require construction initially only of the obligations under the Engagement Agreement, the Term Sheet and the Amended Engagement Letter, there is no question that the Security Agreement, its amendment and the Art Custody Agreement all were part of the bargain contracted for and contemplated during negotiations between the parties to induce Paribas' continued engagement, see *Faberge USA, Inc. v. Ceramic Glaze*, 87 Civ. 5780, slip op. at 4, 1988 WL 31853 (March 1988 S.D.N.Y.) (forum selection clause in main agreement enforceable against party who signed separate guaranty when clause was part of "bargain"), and that the Security and Art Custody Agreements were contemplated by the Term Agreement and executed pursuant to the obligations set forth in the Term Sheet.

Even if the 12(b) defendants' contention were adopted and the court only looked to the Agreements which purportedly govern the liability of the particular claims at issue, the Term Sheet—an Agreement all concede is at issue—contains a New York forum selection clause and a New York choice of law provision and was signed by Shelton, on behalf of himself, SRC, Shelton Land, Shelton Ranches. The 12(b) defendants contest jurisdiction because they did not sign this or either of the other two "underlying agreements."

The terms of the Term Sheet Agreement, however, purport to bind *Shelton Senior Group Members*. The Term Sheet defines "Senior Shelton Group Members" to include Fronie Shelton and each of the corporate defendants. Moreover the Term Sheet expressly provides:

This Term Sheet shall be governed by the laws of the State of New York. Any dispute arising out of this Agreement shall be adjudicated exclusively in the courts of the State of New York or in the federal courts sitting in the Southern District of New York, and SRC hereby agrees that service of process upon it by registered mail at the address shown herein shall be deemed adequate and lawful.

None of the 12(b) defendants have set forth any argument that Shelton was not entitled to bind them to the Term Sheet provisions. Shelton signed the Term Sheet as president of three Shelton corporate entities who do not contest jurisdiction. However, Shelton also acted as the 12(b) defendants agent at least in connection with Term Sheet Agreement and that Agreement is both at issue in the underlying dispute and contains a New York forum selection clause.

Section 302 of the New York Civil Practice Law and Rules, the long-arm statute providing jurisdiction over a foreign defendant who "transacts any business" within the state if the cause of action arises from the transaction of business, provides that "a court may exercise personal jurisdiction over any nondomiciliary ... who in person *or through an agent* 1. transacts any business within the state". N.Y.C.P.L.R. § 302(a)(1) (emphasis added). The transaction of business standard is less demanding than the doing business standard for jurisdictional purposes under C.P.L.R. § 301.

Shelton and the 1404 defendants do not and cannot contest they transacted business in New York, only that they are not "doing business" for § 301 purposes. There is no dispute over whether the cause of action arose out of events that took place, at least in part, in New York. The 12(b) parties only contend that neither Shelton nor Bobbitt ever acted as their agent or engaged in purposeful activities in New York on their behalf, or with the consent of

the 12(b) defendants, and that none of the 12(b) defendants stood to gain directly from the 1404 defendants' entry into the principal agreements.

The New York Court of Appeals recently has addressed what constitutes agency for purposes of § 302. "Plaintiff need not establish a formal agency relationship.... He need only convince the court that [the agent] engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of [the] defendants and that they exercised some control over [the agent] in the matter...." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y. S.2d 195, 199, 522 N.E.2d 40, 44 (1988).

■ The Term Sheet, one of the principal agreements, purports to bind these very 12(b) defendants and the negotiations and discussions giving rise to this and all the agreements took place in part in New York. Additionally, the Term Sheet promises Paribas a security interest in art work or other collateral to secure Paribas' fees and expenses and thereby contemplates the obligations incorporated in the Security Agreement, its Amendment, and the Art Custody Agreement, all signed by the 12(b) defendants. None of the 12(b) defendants contest that Shelton had the power to obligate them through the Term Sheet agreement either to the provisions binding the Senior Shelton Group members or to the provision contemplating the collateralization through the Security and Art Custody Agreements, signed by all of the 12(b) defendants. It would be pure fiction to conclude that all of the 12(b) defendants, without knowledge, consent, or benefit, allowed Shelton to bind them to the Term Sheet agreement and to bind them to the foreseeable exercise of the various security Agreements which they all in turn signed. On the contrary, the 12(b) defendants, as evidenced by their signatures on half of the documents in connection with this dispute, were no less than joint participants in the transaction and as such demonstrated the necessary relationship to Shelton to support a finding of agency on their behalf with respect to Shelton's activities in New

York. *See Cutco Indus. Inc. v. Naughton,* 806 F.2d 361, 366 (2d Cir.1986) (discussing New York cases establishing the test for agency to satisfy the jurisdictional requirements under CPLR § 302(a)(1) and concluding joint venturers are agents of each other).

■ Accordingly, taking Paribas' allegations as true on this motion to dismiss, Shelton and the persons or corporations he acted as agent for are subject to jurisdiction in New York under § 302 on the basis of Shelton's contacts constituting the transaction of business, including multiple visits and communications with Paribas in New York, because the present dispute arises, at least in part, out of those contacts.

### 3. The 1404 Defendants

■ The 1404 defendants have raised no objection to the forum selection clauses they contracted for except their own inadvertence. Shelton's affidavit states:

> Confident that no litigation with Paribas would arise, unaware of the fraudulence by which we had been induced to engage it, and seriously pressed for time, both I and the corporations I represented could afford to concern ourselves only with the substantive terms of the two agreements. We therefore simply did not focus on the location of the forum Paribas had chosen, having been drawn, unwittingly, into a fraud.

Nonetheless, a sophisticated business person with practice in contractual negotiation cannot escape the effect of a forum selection clause by claiming lack of focus. *See Leasing Serv. Corp. v. Graham,* 646 F.Supp. 1410, 1415 (S.D.N.Y.1986) ("a business man acting in a commercial context ... is held to have understood the consequences of his having signed the [forum selection clause]"); *First Interstate Leasing Serv. v. Sagge,* 697 F.Supp. 744, 747 (S.D.N.Y.1988) (business people are presumed to understand the consequences of their acts and understand a simple contract).

Finally, although defendants appear to allege fraud by Paribas, because there has been no allegation that any of the forum

selection clauses in any of the agreements was obtained through fraud, the clauses will be enforced. *See Scherk*, 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14 (forum selection clause unenforceable only if it is shown that "the inclusion of that clause in the contract was the product of fraud or coercion").

## B. The Motion to Transfer is Denied

■ Both the 1404 defendants and the 12(b) defendants in the alternative have moved for transfer under Title 28 U.S.C. § 1404(a) to Texas.[1] That provision states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The burden is on the defendant when it is the moving party to establish that transfer is warranted. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). As this court has observed:

> [t]hat burden is heavy: "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."

*Rackman v. Texas Instruments, Inc.*, 712 F.Supp. 448, 450 (S.D.N.Y.1989) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)).

The factors relevant in determining whether transfer is appropriate include:

> (1) the convenience of the parties, (2) the convenience of material witnesses, (3) the availability of process to compel the presence of unwilling witnesses, (4) the cost of obtaining willing witnesses, (5) the relative ease of access to sources of proof, (6) where the events at issue took place, (7) the practical problems indicating where the case can be tried more expeditiously and inexpensively, and (8) the interests of justice in general.

*National Union Fire Ins. Co. v. Landry*, 677 F.Supp. 704, 708 (S.D.N.Y.1987) (citations omitted).

In a motion for transfer, the presence of a forum selection clause is "a significant factor that figures centrally in the District Court's calculus". *Stewart*, 487 U.S. at 29, 108 S.Ct. at 2243–44. "The district court must also weigh in balance the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.' " *Id.* at 30, 108 S.Ct. at 2244. *see also Red Bull Assoc. v. Best Western Int'l, Inc.*, 862 F.2d 963, 966 (2d Cir.1988) (after *Stewart*, "§ 1404(a) transfer motions are not governed by the standard articulated in *Bremen* but by the terms of § 1404(a) itself").

The Shelton parties contend that the multiple factors to be considered on this motion—including the place of occurrence of the underlying events, the place where the parties' contractual obligations were primarily to be performed, the relative convenience of the parties and the circumstances surrounding the parties' entry into the relevant agreements—all compel disregard of the forum selection clauses.

Even though Paribas has a small office in Texas, its principal office and the majority of its witnesses are in New York. All of the defendants reside and work in Texas, however, the Shelton Parties constitute only a handful of principal characters that control or represent all of the corporate defendants and thus cannot show that the balance of convenience favors the Shelton Parties. Moreover, several courts have found that the inconvenience of traveling to defend an action is not a reason to invalidate the plaintiff's choice of forum, especially if sophisticated business people entered into the contract specifying a forum and such a result would be foreseeable. *See First Interstate Leasing Serv.*, 697 F.Supp. at 747.

---

1. Either court to which the Shelton parties seek to transfer would be appropriate forums in which to proceed with this litigation. Each court would have diversity jurisdiction pursuant to 28 U.S.C. § 1332 as defendants all are citizens of or incorporated in Texas and Paribas is incorporated under the law of Delaware and venue would properly lie in either court under 28 U.S.C. § 1391(a).

The events at issue occurred in Texas, Florida, and New York and the material non-party witnesses live in all of those states as well as California, Colorado and Illinois. Although the Shelton parties' primary obligations were to occur in Texas and the Shelton parties' documents exist there, Paribas' obligations were to occur primarily in New York and their documents exist here.

Moreover, the litigation pending in Texas regarding the security interest in a particular painting and involving the trustees of trusts for the benefit of Shelton's children is not relevant to the transfer of this case. The suits could not be consolidated both because one of the plaintiffs in the Texas case is a New York resident and therefore would defeat diversity jurisdiction and that case is reactive to and would not settle the issues presented in the instant case.

The Shelton Parties have set forth no balance of reasons to justify transfer from plaintiff's choice of forum, for which the Shelton Parties contracted. New York has a reasonable relationship to the contracts and to the dispute. All of the agreements provide that New York Law governs. Four provide a New York forum selection clause. The Art Custody Agreement affirmatively states that none of the Shelton Parties will contest jurisdiction or venue on *forum non conveniens* ground. Finally, the interests of justice and the remaining considerations relevant to a § 1404 transfer motion do not militate in favor of transferring this case to a Texas forum.

Conclusion

For the reasons set forth above, the motion to dismiss and the motion to transfer are denied. Settle order on notice.