**Arthur Allan STAMM, Maureen R. Olivo and Philip M. Stamm, Plaintiffs,**

v.

**BARCLAYS BANK OF NEW YORK, Barclays Bank PLC, and Corporation of Lloyd's, also known as Society & Council of Lloyd's, doing business as Lloyd's of London, Council of Lloyd's, Committee of Lloyd's, Sedgwick Lloyd's Underwriting Agents Ltd., and Syndicates 0317, 0418 and 0421 at Lloyd's of London, Defendants.**

No. 96 Civ. 5158(SAS).

United States District Court, S.D. New York.

March 26, 1997.

Mark D. Lebow, Coudert Brothers, New York City, for Plaintiffs.

William A. Meehan, Mendes & Mount, L.L.P., Lawrence W. Pollack, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Philip Walsh Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, District Judge:

Plaintiffs filed the instant action for common law fraud and violations of Article 22–A of the New York General Business Law[1] in New York state court on June 26, 1996. Defendant Lloyd's[2] removed the action to this court on July 9, 1996 pursuant to 12 U.S.C. § 632, 9 U.S.C. §§ 203 and 205, 28 U.S.C. § 1331, 28 U.S.C. § 1441(a) and (d), and 28 U.S.C. § 1446. Plaintiff moved to remand to state court, and I denied this motion in an Opinion and Order dated October 23, 1996. See *Stamm v. Barclays Bank of New York et al.*, No. 96 Civ. 5158, 1996 WL 614087 (S.D.N.Y.1996). Plaintiffs now move to certify the October 23, 1996 Order for appeal pursuant to 28 U.S.C. § 1292(b). Defendants also move to dismiss plaintiffs' action pursuant to, *inter alia*, Rules 9(b) and 12(b)(3) of the Federal Rules of Civil Procedure and the doctrine of forum non conveniens. For the reasons that follow, plaintiffs' motion is denied and defendants' motion is granted.

**I. Factual Background**

A. Brief Description of Lloyd's and "Names"

Lloyd's of London ("Lloyd's") is a market for insurance underwriting. The Council and Committee of Lloyd's promulgate regulations that govern this insurance underwriting market, and enforce compliance with those regulations. Syndicates are entities that compete

---

1. N.Y. General Business Law §§ 349 et seq. (McKinney 1988).

2. "Lloyd's" refers here to defendants Corporation of Lloyd's, Society and Council of Lloyd's, Committee of Lloyd's, and Lloyd's of London.

with each other for underwriting business, and are each managed by a Managing Agent. Each Managing Agent is liable for its own syndicate's financial well-being, and is responsible for raising capital and underwriting business. In turn, each syndicate's capital comes from Names, who are represented in their dealings with Lloyd's by Member's Agents. Names fall into two categories: Working Names, who are insiders employed by Lloyd's or the Managing and Member's Agents and External Names, who are passive investors. *See Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1357–8 (2d Cir.) (describing Lloyd's as "a market somewhat analogous to the New York Stock Exchange" and detailing its structure), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). *See also In re Lloyd's American Trust Fund Litigation*, 928 F.Supp. 333, 335–6 (S.D.N.Y. 1996) (also describing in detail the structure of Lloyd's "unique and complex insurance market"). Plaintiffs are External Names.

### B. Lloyd's Allegedly Fraudulent Solicitation of Plaintiffs

Plaintiffs allege that defendants engaged in a scheme to defraud them by offering and selling investment contracts in the form of memberships in Lloyd's. It is alleged that, in recruiting plaintiffs, defendants failed to disclose material information in connection with investment in Lloyd's. Specifically, plaintiffs claim that defendants failed to disclose: (1) exposure to unquantifiable liability as a result of asbestos and pollution risks underwritten decades ago and passed on to plaintiffs; (2) joint liability for the underwriting losses of other investors despite representations that the plaintiffs were only subject to liability for those risks they agreed to underwrite; (3) the collection of funds from plaintiffs for undocumented losses; and (4) exposure to unquantifiable liability for claims that may be brought at any time in the future. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss ("Plaintiffs' Memo") at 3 (citing Declaration

of Arthur A. Stamm ("Stamm Decl."), dated December 17, 1996 at ¶ 24).

### C. The Original General Undertaking and the New York Collateral

At the time of their recruitment, plaintiffs signed a series of agreements, including a General Undertaking Agreement (the "Original Undertaking").[3] The Original Undertaking was signed by each plaintiff in New York, and expressly requires each plaintiff to execute a variety of subordinate agreements, instruments, and acknowledgments under by-laws adopted by Lloyd's. *See* Stamm Decl. at ¶ 48. The Original Undertaking contained no forum selection or choice-of-law clauses.

Plaintiffs were also required to post collateral in connection with their membership in Lloyd's for the purpose of meeting potential liabilities. Arthur Stamm deposited with defendant Barclays Bank of New–York 22,516 shares of common stock of Stamm International Corporation. Maureen Olivo and Philip Stamm posted shares of the same stock, in the amounts of 10,620 and 10,654, respectively. In turn, Barclays PLC issued guarantees to Lloyd's in the amount of $30,000 and $157,000 for Arthur Stamm; $157,000 for Maureen Olivo; and $105,000 for Philip Stamm. *See id.* at ¶ 43.

### D. The New General Undertaking

In April of 1986, Lloyd's sent plaintiffs a new form General Undertaking (the "New Undertaking") and informed plaintiffs that they were to sign the New Undertaking if they wished to continue underwriting at Lloyd's. *See id.* at ¶ 50. Plaintiffs allege that if they had chosen to withdraw from Lloyd's rather than sign the New Undertaking, they would have faced "substantial" termination costs. Plaintiffs also allege that their collateral would have been held by Lloyd's after they withdrew and would have remained encumbered for "years to come" *See* Plaintiffs' Memo at 8 (citing Stamm Decl. ¶¶ 54–56). The New Undertaking contains a forum selection clause[4] (the "FS clause")

---

3. Arthur Stamm signed the Original Undertaking in 1977, Maureen Olivo signed the Original Undertaking in 1979, and Philip Stamm signed the

Original Undertaking in 1980. *See* Stamm Decl. at ¶ 49.

4. The forum selection clause states: "Each party hereto irrevocably agrees that the courts of Eng-

requiring all litigation to be brought in England, and a choice-of-law clause [5] (the "COL clause") requiring all disputes to be governed by the laws of England. Each plaintiff signed the New Undertaking.

## II. Plaintiffs' Motion to Certify for Interlocutory Appeal

### A. Applicable Legal Standard

Section 1292(b) allows for an appeal from an otherwise unappealable interlocutory order upon consent of both the District Court and the Court of Appeals. The statute states in pertinent part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, [s]he shall so state in writing in such order. The Court of Appeals ... may thereupon, in its discretion, permit an appeal to be taken from such order....

28 U.S.C. § 1292(b). The Court of Appeals recently examined the legislative history and purpose of 1292(b) in *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863 (2d Cir.1996), and concluded:

> It is a basic tenet of federal law to delay appellate review until a final judgment has been entered. Section 1292(b)'s legislative history reveals that although that law was designed as a means to make an interlocutory appeal available, it is a rare exception to the final judgment rule that generally prohibits piecemeal appeals. The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation.

*Id.* at 865–66 (citations omitted) (also noting that 35 motions for interlocutory appeal were filed from 1994 through 1995, of which only eight were granted by the Second Circuit). Hence, in determining whether to certify an interlocutory order for appeal, a district judge should focus primarily on the question of whether doing so would preserve judicial resources by avoiding "fruitless" litigation. *Id.* at 866 (citing Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 Harv. L.Rev. 607, 609–11 (1975)).

### B. Analysis

■ Plaintiffs cite several cases to support their argument that this dispute does not arise out of "international or foreign banking transactions" within the meaning of 12 U.S.C. § 632, and therefore that remand is appropriate. *See, e.g., Bank of New York v. Bank of America*, 861 F.Supp. 225, 232 (S.D.N.Y.1994) ("a District Court cannot find that it has § 632 jurisdiction merely because there was a federally chartered bank involved, there were banking-related activities, and there were foreign parties") and *Lazard Freres & Co. v. First National Bank of Maryland*, No. 91 Civ. 0628, 1991 WL 221087 (S.D.N.Y.1991). This argument, however, half-misses the mark. The October 23, 1996 Order held:

> [T]his dispute arises out of what might also be characterized as "international financial operations" within the meaning of § 632. As Judge Sweet wrote, the plain meaning of the statutory phrase "other international or foreign financial operations" is international or foreign financial operations other than banking. *See In re Lloyd's American Trust Fund Litigation*, [928 F.Supp. at 341]. Thus, even if the parties' transactions do not constitute "international or foreign banking," they un-

---

5. The choice-of-law clause states: "The rights and obligations of the parties arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and any other matter referred to in this Undertaking shall be governed by and construed in accordance with the laws of England." *See* Lloyd's Memo at 7 (citing Clause 2.1 of the New Undertaking).

land shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the [Name's] membership of and/or underwriting of insurance business at, Lloyd's." *See* Lloyd's Memorandum in Support of Motion to Dismiss ("Lloyd's Memo") at 6 (citing Clause 2.2 of the New Undertaking).

doubtedly fall into the general statutory category of "financial operations."

*Stamm,* No. 96 Civ. 5158, 1996 WL 614087, at *2.

Plaintiffs now argue that in *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 791 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981), the Court of Appeals rejected the proposition that § 632 jurisdiction can be based upon non-banking international financial operations. *See* Plaintiffs' Reply Memorandum in Support of Motion to Certify Order for Appeal ("Plaintiffs' Reply") at 3. I disagree. *Vintero Sales* did not read the clause "other international or foreign financial operations" out of § 632. It merely held that intervention by nationally chartered banks cannot serve as a basis for § 632 jurisdiction. *See id.* at 792 ("intervention will not be permitted to breathe life into a 'nonexistent' law suit") (quotation and citation omitted). *See, e.g., In re Lloyd's American Trust Fund Litigation,* 928 F.Supp. at 341 (§ 632 provides for jurisdiction over disputes arising from international financial transactions that do not involve banking operations); *Travis v. National City Bank of New York,* 23 F.Supp. 363, 366 (E.D.N.Y. 1938) (same). *See also* Robert M. Brill and James J. Bjorkman, *Federal Court Jurisdiction Over International Banking Transactions,* 110 Banking L.J. 118, 128 (1993) (same).

Not surprisingly, plaintiffs do not argue that the underlying transactions in this case are not "international or foreign financial operations". As I noted in my October 23, 1996 Opinion, "financial operations" are commonly understood as those operations that "provide . . . capital or loan money as needed to carry on business". *Black's Law Dictionary* 568 (5th ed.1979) (defining "finance"). *See In re Lloyd's American Trust Fund Litigation,* 928 F.Supp. at 341 (§ 632 term "international or foreign financial operations"

should be given a general or dictionary meaning); *Travis,* 23 F.Supp. at 367 (same).

The underlying transaction in this case was unquestionably an "international or foreign financial operation" within the meaning of § 632. Plaintiffs' investments in Lloyd's as underwriters (or "Names") and concomitant pledges of capital to Lloyd's syndicates are equivalent to the purchase of a security. *See Roby,* 996 F.2d at 1358 (declining to rule on the question of whether investments in Lloyd's syndicates constitute "securities" under the securities laws, but assuming for purposes of appeal that they do). It is commonly understood that the sale of securities for the purposes of raising capital is a kind of financial operation. When this type of transaction takes place between a British issuer and American investors, it must fairly be called "international" in nature. *See In re Lloyd's American Trust Fund Litigation,* 928 F.Supp. at 341 (investment in Lloyd's constitutes an international financial operation for purposes of § 632); *Travis,* 23 F.Supp. at 363 (issuance of securities by German corporation to American buyers constituted foreign financial operations for purposes of § 632).

Plaintiffs present no arguments or case law to suggest that there is "substantial ground for difference of opinion" on the issue of whether the underlying transaction in this case constitutes an international financial operation within the meaning of § 632. Furthermore, plaintiffs' argument that non-banking transactions may not serve as a basis for § 632 jurisdiction is based on an incorrect interpretation of the statute and controlling case law. Plaintiffs' motion to certify the October 23, 1996 Order for appeal is therefore denied.

### III. Defendants' Motion to Dismiss

██ As has so often been the case in actions brought by American Names against Lloyd's, the venue of plaintiffs' case turns on the enforceability of the FS and COL clauses contained in the New Undertaking.[6] Each of

---

6. In similar cases brought by American Names, six Circuits have enforced Lloyd's FS and COL clauses. *See Allen v. Lloyd's of London,* 94 F.3d 923 (4th Cir.1996); *Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227 (6th Cir.1995); *Bonny v. Society of*

*Lloyd's,* 3 F.3d 156 (7th Cir.1993), *cert. denied,* 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); *Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 208 (7th Cir.1993); *Roby,* 996 F.2d at 1362–1366; *Riley v. Kingsley Underwriting Agencies,*

the defendants argues that this Court must enforce the FS and COL clauses and thus dismiss plaintiffs' action. In response, plaintiffs stridently contend that these clauses may not be enforced because they were procured by fraud and overreaching. For reasons explained below, I conclude that plaintiffs have failed to allege facts that, if taken as true for the purposes of determining this motion, suffice to clearly show that their consent to the FS and COL clauses of the New Undertaking was induced by fraud or overreaching and accordingly grant defendants' motion to dismiss.

### A. Legal Standards Applicable to FS and COL Clauses

■ Forum selection and choice-of-law clauses are presumptively valid where the underlying transaction is fundamentally international in nature. *See M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972); *Roby*, 996 F.2d at 1362. As has already been discussed, the transactions here are fundamentally international in nature, and hence plaintiffs bear the burden of establishing why the FS and COL clauses should not be enforced. This may be accomplished by a clear showing that the clauses were "unreasonable" or "unjust". *Zapata Off–Shore Co.*, 407 U.S. at 15, 92 S.Ct. at 1916. Neither the Supreme Court nor the Court of Appeals for the Second Circuit has defined precisely the circumstances that would make it unreasonable or unjust to enforce a forum selection or choice-of-law clause. However, it is now established in this Circuit that the following factors should be considered:

(1) If their incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party will for all practical purposes be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clauses contravene a strong public policy of the forum state.

*Roby*, 996 F.2d at 1363 (citations to *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) omitted). In evaluating the reasonableness of FS or COL clauses, a court must analyze the contract in which they are found, including the benefits to both offeree and offeror flowing from those clauses. *See Carnival Cruise Lines, Inc.*, 499 U.S. at 593–94, 111 S.Ct. at 1527–28 (observing that cruise ship company benefitted financially from forum selection clause, and that this benefit was passed on to passengers in the form of less expensive tickets).

■ A claim of fraud in the inducement of a contract is insufficient to invalidate a forum selection or choice-of-law clause found in that contract. Rather, it is the inclusion of those specific clauses plaintiffs seek to avoid that must have been induced by fraud. *See Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 2457 n. 14, 41 L.Ed.2d 270 (1974) (involving arbitration clause); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967) (same); *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 10 (2d Cir.1995) (forum selection clause specifying Greece as sole jurisdiction in which claims could be brought against carrier); *AVC Nederland B.V. v. Atrium Investment Partnership*, 740 F.2d 148, 158 n. 16 (2d Cir.1984) (forum selection clause and choice-of-law clauses specifying Utrecht as sole jurisdiction and Dutch laws as applicable law); *Tufts v. Corporation of Lloyd's*, No. 95–3480, 1996 WL 533639 (S.D.N.Y. Sept. 19, 1996) (Lloyd's FS and COL clauses); *Paribas Corp. v. Shelton Ranch Corp.*, 742 F.Supp. 86, 92–93 (S.D.N.Y.1990) (forum selection clause and choice-of-law clauses specifying New York as sole jurisdiction and New York law as applicable law). Therefore, to overcome the presumed validity of the FS and COL clauses, plaintiffs must plead specific fraudulent acts or statements by which defendants induced their consent to these clauses. As with all claims of fraud, plain-

---

*Ltd.*, 969 F.2d 953 (10th Cir.), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992). *But see Richards v. Lloyd's of London*, 107 F.3d 1422 (9th Cir.1997) (Lloyd's FS and

COL clauses held to be invalid); *Leslie v. Lloyd's of London*, No. H–90–1907, 1995 WL 661090 (S.D.Tex. Aug.20, 1995) (same).

tiffs' claims must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *See, e.g., Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 960 (10th Cir.) (involving claim against Lloyd's by Name alleging fraud with respect to COL clause), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992); *Tufts,* 1996 WL 533639, at *5.

Defendants have brought their motion to dismiss for improper venue based on the FS and COL clauses under, *inter alia,* Rule 12(b)(3) and the doctrine of forum non conveniens. There appears to be a split among the Courts of Appeal as to whether Rule 12(b)(3) is the proper vehicle to enforce a forum selection clause. *Compare Lambert v. Kysar,* 983 F.2d 1110, 1112 n. 1 (1st Cir.1993) (dismissal based on forum selection clause should be pursuant to Rule 12(b)(6) not Rule ·12(b)(3)) *with Commerce Consultants Int'l. Inc. v. Vetrerie Riunite, S.p.A.,* 867 F.2d 697, 698–99 (D.C.Cir.1989) (forum selection clause required dismissal pursuant to Rule 12(b)(3)). *See also Riley,* 969 F.2d at 956 (a "motion to dismiss based on a forum selection clause frequently is analyzed as a motion to dismiss for improper venue under [Rule] 12(b)(3)"); *Haskel v. FPR Registry, Inc.,* 862 F.Supp. 909, 913–914 (E.D.N.Y.1994) (dismissal under Rule 12(b)(3) is not a proper vehicle for enforcing forum selection clause; instead, the court will *sua sponte* transfer the case). That *Roby* was decided under Rule 12(b)(6), *see Roby v. Corporation of Lloyd's,* 796 F.Supp. 103, 111 (S.D.N.Y.1992), without comment from the Second Circuit on appeal, only confuses matters more.

It is not necessary for me to enter this tangled web. Whichever rule applies, it is well-established that plaintiffs must demonstrate that the FS and COL clauses were incorporated into the New Undertaking by fraud or overreaching to defeat defendants' motion to dismiss. In deciding this question on a· motion to dismiss, it is appropriate to consider documents upon which the complaint relies and which are integral to the complaint, such as declarations or affidavits,

without converting the motion to one for summary judgment. *Cf. International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (court may consider documents integral to the complaint on Rule 12(b)(6) motion for failure to state a claim). Furthermore, the court must accept as true material facts alleged in plaintiffs' complaint and draw all reasonable inferences in the nonmovant's favor. *Cf. Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995) (standard applied in determining Rule 12(b)(6) motion). Thus, assuming plaintiffs' allegations of material fact to be true, do these facts clearly show that the FS and COL clauses were incorporated into the New Undertaking by defendants' fraud or overreaching?

## B. Plaintiffs' Fraud Claim

As discussed above, plaintiffs claim the following. As early as 1969, insiders at Lloyd's became aware that they might face massive liability arising from asbestos, pollution and health hazard claims. Lloyd's then began to recruit American investors ("Names") to raise capital to cover those claims, but failed to disclose the full extent of Lloyd's potential liability to these American Names. Plaintiffs were among the American Names recruited by Lloyd's. Lloyd's also successfully lobbied Parliament (in 1982 and 1986) to grant Lloyd's limited immunity from civil suits by Names in English courts, and then (in 1986) required American Names to sign forum selection and choice-of-law clauses requiring all actions against Lloyd's to be brought in English courts under English law.[7] *See* Stamm Decl. Exs. 1, 5.

None of these claims, if presumed to be true, directly allege that the FS or COL clauses were incorporated into the New Undertaking by fraud or overreaching. With regard to the New Undertaking, plaintiffs merely allege that:

1. In April 1986, Lloyd's sent plaintiffs the New Undertaking for signing in New York.

---

7. Section 14 of the Lloyd's Act of 1982 immunizes Lloyd's from claims of misrepresentation absent a showing of bad faith. Also, Section 42 of the Financial Services Act of 1986 immunizes

Lloyd's and Lloyd's Agents from fraud claims in connection with securities transactions. *See* Plaintiffs' Memo at 12–13.

2. Lloyd's informed plaintiffs that they had to execute the New Undertaking if they wished to continue underwriting at Lloyd's. Plaintiffs were given no opportunity to negotiate the terms of the New Undertaking.

3. If plaintiffs elected not to sign the New Undertaking, they would have been forced to withdraw from Lloyd's and therefore faced substantial termination costs and expenses amounting to thousands of dollars. Plaintiffs would have remained liable for potential claims and their collateral would have remained encumbered after their withdrawal.

4. Lloyd's did not inform plaintiffs that Parliament had granted Lloyd's qualified immunity from suit by Names in English courts.

5. Lloyd's did not inform plaintiffs of the true extent of the potential liability they faced arising from asbestos and other claims.

*See* Stamm Decl. at ¶¶ 50–59.[8]

Plaintiffs also argue that Lloyd's fraudulent intent may be inferred from the "relationship between the incredible increase by Lloyd's in the recruitment of [non-British] Names, the timing of Lloyd's knowledge of the concealed asbestos crisis, Lloyd's lobbying efforts, Parliament's grant of exemptions and immunity and Lloyd's requirement that Names sign the [New Undertaking] including the Forum Selection Clause and the Choice of Law Clause ... " *Id.* at ¶ 60. Plaintiffs then claim that, had Lloyd's informed them of their potential liability, and of Lloyd's qualified immunity from suit by Names in English courts, they would not have assented to the FS and COL clauses of the New Undertaking. *See id.* at ¶ 62.

While plaintiffs' claims of fraud are initially appealing, they cannot withstand the harsh light of judicial scrutiny. First, I note that the legal relationship between Lloyd's and plaintiffs was not that of a fiduciary and beneficiary, but rather a contractual arrangement resulting from arms' length bargaining between sophisticated businessmen. As a result, Lloyd's had no obligation to inform plaintiffs of English law, even assuming arguendo that English law was less favorable to plaintiffs should they choose to sue Lloyd's in an English court. In reaching this conclusion, I note that the Seventh Circuit has held in a similar case that Lloyd's failure to explain English law to Names did not amount to fraudulent inducement of the FS and COL clauses:

> Plaintiffs contended at oral argument that the forum selection and choice of law clauses were induced by fraud. They claim that defendant did not disclose that under British law, [defendant Lloyd's] enjoys immunity from certain causes of action for damages and that [defendants Lloyd's and Lime Street] are 'exempt' persons under the English securities laws and are therefore exempt from the provisions that protect investors.... We note only that a party to a contract has an obligation to read its provisions. It is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them. 3 A. Corbin, *Corbin on Contracts* 607 (1989). Nothing excuses plaintiffs for not being aware of the substantive provisions of English law that the forum selection clause incorporates into their agreement.

*Bonny,* 3 F.3d 156, 160 n. 10. *See also Richards v. Lloyd's of London,* No. 94–1211–IEG, 1995 WL 465687, at *8 (S.D.Cal.1995) ("[T]he Court reiterates that defendants had no duty to explain English law to plaintiffs. Nondisclosure does not rise to the level of fraudulent concealment."), *reversed on other grounds,* 107 F.3d 1422 (9th Cir.1997). Plaintiffs do not allege that they asked defendants to explain applicable English law before signing the New Undertaking and that their requests were denied. Therefore, their failure to fully comprehend the ramifications of the FS and COL clauses cannot be attributed to defendants' alleged fraudulent conduct. *See Doctor's Associates, Inc. v.*

---

**8.** Plaintiffs do not claim that the FS and COL clauses in the New Undertaking were not brought to their attention. *See, e.g., Effron,* 67 F.3d at 9 ("The legal effect of a forum-selection clause depends in the first instance upon whether its existence was reasonably communicated to the plaintiff") (citations omitted).

732

*Distajo,* 107 F.3d 126, 134–35 (2d Cir.1997) (finding that no fraudulent misrepresentation regarding forum selection clause can be found where plaintiffs failed to read and understand them despite "ample opportunity" to do so).

Second, plaintiffs claim that they would never have signed the New Undertaking in 1986 had Lloyd's informed them of the true extent of their potential liability. While this may be so, it does not help plaintiffs to avoid the FS and COL clauses. Plaintiffs also maintain that they would never have chosen to become Names in the first instance had they known of their true potential liability. No doubt this is true: those who can spot a losing bet before the dice are rolled do not place their chips on the table. Yet plaintiffs may not attack the FS and COL clauses by boot-strapping their claims that Lloyd's fraudulently induced the plaintiffs' initial decisions to become Names.

As the case law cited above makes plain, plaintiffs' claims regarding Lloyd's allegedly fraudulent failure to disclose risks facing new investors must properly be understood as an attack on the validity of the New Undertaking as a whole. It may indeed be true that plaintiffs would have chosen to withdraw from membership in Lloyd's rather than sign the New Undertaking had they been informed of the true extent of their potential liability. Yet without specific allegations that the FS and COL clauses were incorporated into the New Undertaking as a result of defendants' fraud, this argument cannot be used to avoid the enforcement of those specific clauses. *See, e.g., Prima Paint Corp.,* 388 U.S. 395, 403–404, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967).

### C. Plaintiffs' Claim of Unconscionability

■ The doctrine of unconscionability dictates that, as with any other type of contract, courts should decline to enforce any forum selection or choice-of-law clause that is the product of overreaching.[9] *See, e.g., Campbell Soup v. Wentz,* 172 F.2d 80 (3d Cir.1948) ("[T]he sum total of [the contract's]

provisions drives too hard a bargain for a court of conscience to assist"). Contracts will be found to be unconscionable where a court recognizes "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party". *Williams v. Walker–Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965). *See also Doctor's Associates, Inc. v. Jabush,* 89 F.3d 109, 113 (2d Cir.1996) ("An unconscionable bargain is one which no man in his senses and not under delusion would make on the one hand, and ... no honest and fair man would accept on the other") (quoting *Hume v. United States,* 132 U.S. 406, 411, 10 S.Ct. 134, 136, 33 L.Ed. 393 (1889)). As the doctrine is designed to protect against unfair bargains and unfair bargaining practices, unconscionability is determined by reference to the relative benefit to the parties at the time of contracting, the nature and methods employed in negotiating the contract, and the relative bargaining power of the parties. *See Distajo,* 107 F.3d at 135–36. *See also Jabush,* 89 F.3d at 113 (citing *United States v. Bedford Assocs.,* 657 F.2d 1300, 1312–13 (2d Cir.1981), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982)). *See generally* 14 *Williston on Contracts* §§ 1632–1632B (3d ed.1972) (discussing equity and unconscionable agreements).

■ Of course, courts cannot fail to enforce contracts because they result in hardship to one party. Thus, the doctrine of unconscionability is primarily designed to defend those who cannot protect themselves. *See Williams,* 350 F.2d at 449; *Hertz Corp. v. Attorney General of New York,* 136 Misc.2d 420, 518 N.Y.S.2d 704, 709 (Sup.Ct. N.Y.Co.1987) ("[T]he touchstone of unconscionability is oppression"). One court expressly addressed the tension between the principles of freedom of contract and the doctrine of unconscionability:

People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a

9. "Overreaching" has been defined as "that which results from an inequality of bargaining power or other circumstances in which there is

an absence of meaningful choice on the part of on of the parties." *Black's Law Dictionary* 1104 (6th ed.1990).

bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement of terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.

*Carlson v. Hamilton,* 8 Utah 2d 272, 274–75, 332 P.2d 989, 990–991 (Utah 1958) (cited in 14 *Williston on Contracts* § 1632 at 52 (3d ed.1972)).

■ I find that the FS and COL clauses contained in the New Undertaking cannot justly be deemed unconscionable. Admittedly, these clauses are now disadvantageous to plaintiffs. Yet the record does not indicate that Lloyd's employed unfair bargaining methods in negotiating plaintiffs' acceptance; rather, the record indicates merely that Lloyd's presented the New Undertaking on a take-it-or-leave-it basis. Nor was there so gross an inequality in bargaining power between plaintiffs and defendants that plaintiffs may now claim to have lacked any meaningful option other than to assent to the FS and COL clauses. These plaintiffs, who have sufficient wealth and sophistication to retain the best legal counsel, cannot convincingly argue that they should be placed among the class of poor, uneducated and naive that the doctrine of unconscionability was crafted to protect.

Plaintiffs' hue and cry regarding the "substantial" termination cost they would have faced if they had not signed the New Undertaking does not advance their cause. Plaintiffs would have the Court believe they agreed to unfavorable FS and COL clauses in part because they wished to avoid the costs of withdrawing from Lloyd's. Yet plaintiffs do not claim that such costs would have constituted such a financial hardship as to eliminate the option to withdraw. Therefore, even if each of plaintiffs' allegations are presumed to be true, these allegations could not overcome the reasonable assumption that plaintiffs signed the New Undertaking because they believed their continued partic- ipation in the Lloyd's underwriting business would be profitable.

Contracts that result from unwise business decisions are not, without more, unconscionable. Plaintiffs have not clearly shown that the FS and COL clauses were the product of Lloyd's fraud or overreaching, and thus have failed to rebut the presumed validity of those clauses. Accordingly, I have no choice but to enforce them and dismiss this action for improper venue.

## D. Leave to Amend

■ Plaintiffs did not bring their claims under United States securities laws, and did not contend that the FS and COL clauses violate United States public policy because plaintiffs lack an adequate remedy in England to vindicate their substantive rights. No doubt plaintiffs chose not to do so, but rather to bring their claims under New York law, because they believed that *Roby* effectively foreclosed such claims. While *Roby* specifically stated that "[w]e believe that there is a serious question whether United States public policy has been subverted by the Lloyd's clauses", the Court ultimately decided that the *Roby* plaintiffs had failed to overcome the clauses' presumed validity. *Roby,* 996 F.2d at 1363.

Yet a close reading of *Roby* indicates that the Second Circuit in large measure relied on what it believed to be the SEC's tacit approval of Lloyd's disclosure and issuing practices:

We turn now to address whether adequate remedies are available to deter issuers from issuing securities without disclosing sufficient information to permit investors to make informed decisions. We believe that this policy concern is somewhat diluted in this case because the SEC consistently has exempted Lloyd's from the registration requirements of the securities laws. Apparently the SEC has decided that Lloyd's means test meets the requirements of Regulation D. We are extremely reluctant to dispute the SEC's apparent judgment that the Roby Names are sophisticated enough that they do not need the disclosure protections of the securities laws.... [W]e cannot say that the poli-

cies underlying our securities laws will be offended by the application of English law. *Id.* at 1365–66.

It may have been true when *Roby* was decided in 1993 that the SEC had taken no position as to whether Lloyd's FS and COL clauses violated United States public policy by depriving American investors of adequate remedies. Now, however, the SEC has filed an *amicus curiae* brief in a case similar to this one, *Richards v. Lloyd's of London,* 107 F.3d 1422 (9th Cir.1997), that points to the deficiencies in English securities law. The Ninth Circuit expressly relied on the SEC's position in concluding that the Lloyd's FS and COL clauses should not be enforced because "[m]ajor gaps exist in the English substantive law of securities fraud" and that "[t]he available English remedies are not adequate substitutes for the firm shields and finely honed swords provided by American securities law." *Id.* at 1430.[10] Given the SEC's newly-adopted position regarding Lloyd's practices in recruiting American Names, it is unclear whether *Roby* continues to squarely preclude the instant plaintiffs from arguing that the FS and COL clauses in the New Undertaking are unreasonable because they violate United States public policy by depriving American investors of adequate remedies. In light of the aforementioned developments, I dismiss plaintiffs' action with leave to amend their Complaint in accordance with this Opinion.

## IV. Conclusion

Plaintiffs' motion to certify the October 23, 1996 Order for interlocutory appeal is denied. Defendants' motion to dismiss is granted with leave to amend.

---

**10.** Judge Noonan found: "Three major deficiencies exist [in English securities law]: (1) There is no remedy in England for failure to register securities as required by Section 12(1) of the 1933 Act. (2) There is no remedy in England against Lloyd's for negligent misrepresentation as provided by Section 12(2); the Lloyd's Act, 1982, expressly immunizes Lloyd's from any claim 'for negligence or other tort, breach of duty or otherwise ... unless the act or omission complained of ... was done or omitted to be done in bad faith.' (3) In the United States there is liability for controlling persons under Section 15 of the 1933 Act and Section 20(a) of the 1934 Act; there is no such liability in England." *Richards,* 107 F.3d at 1429–30.